Filed 11/19/12

# IN THE SUPREME COURT OF CALIFORNIA

CITY OF ALHAMBRA et al., )
                                              )

          Plaintiffs and Appellants, )

                                               )                 S185457

    v. )

                                               )       Ct. App. 2/3 B218347

COUNTY OF LOS ANGELES et al., )

                                                 )      Los Angeles County

          Defendants and Respondents. )    Super. Ct. No. BS116375
_____ )

By statute, counties are responsible for the administration of local property taxes by assessing and collecting them and then disbursing the revenue to the various cities, special districts, schools, and other entities within the county. Some of the revenue, however, must be allocated to each county's Educational Revenue Augmentation Fund (sometimes referred to as ERAF) — a state-created fund that reallocates portions of local property tax revenue to fulfill the state's constitutional obligation to fund education at specified levels. In order to cover county costs in administering the property tax system, a county is statutorily authorized to impose a property tax administration fee on each city or other entity within its borders. The property tax administration fee is based on an apportionment of the amount of property tax revenue allocated to the city or other entity. But any revenues allocated from these cities and entities to the county's ERAF are exempt from this fee. At issue here is a dispute between Los Angeles County (County) and 47 cities (Cities) within the county regarding how County calculates and imposes property

1

tax administration fees on Cities for their share of County's costs in administering the property tax system. In 2004, two different budgetary measures were enacted diverting local property tax revenue that would have been deposited into each county's ERAF to instead fund various state budget gaps, but the state otherwise made whole each county's ERAF contribution through the allocation of other state funds. A dispute arose after the enactment of these measures when County included in the calculations for the administration fees it imposed on Cities the tax revenue that had been earmarked for the County ERAF but was diverted by the 2004 budgetary measures.

County takes the position that these two budgetary measures allowed it to impose property tax administration fees on the diverted local property taxes because they no longer funded the County ERAF, but were instead used to fund state budget gaps and thus have lost their exempt status. The effect of County's position has allowed it to withhold from Cities an additional $4.8 million in fiscal year 2006-2007 and $5.3 million in fiscal year 2007-2008 in property tax administration fees. Cities, however, take the position that the ERAF exemption from the fee still applied under the 2004 legislation and that Revenue and Taxation Code section 97.75, enacted as part of the 2004 legislation, prohibited County's method of calculating the property tax administration fee. We agree with Cities' position, and we affirm the judgment of the Court of Appeal, which reached the same conclusion.

## I. PROCEDURAL HISTORY

In 2008, Cities[1] petitioned the trial court for a writ of administrative mandate, under Code of Civil Procedure section 1085, challenging County's

---

[1]     The plaintiff cities are: City of Alhambra, City of Arcadia, City of Artesia, City of Baldwin Park, City of Bell Gardens, City of Bellflower, City of Bradbury,

*(footnote continued on next page)*

method of calculating the property tax administration fee and seeking a writ ordering County and its auditor-controller to reimburse Cities for the amount disputed in fiscal year 2006-2007.  The parties agreed to try the matter by reference under Code of Civil Procedure section 638 and stipulated to most of the relevant facts.  Following a trial, the referee ruled in mid-2009 that County's method of calculating the disputed fee was consistent with legislative intent and did not violate Revenue and Taxation Code section 97.75.[2]  Cities appealed, and the Court of Appeal reversed, relying almost exclusively on the plain meaning of section 97.75 to conclude that County's method of calculation was unlawful.  We granted County's petition for review.[3]

---

*(footnote continued from previous page)*

City of Burbank, City of Calabasas, City of Carson, City of Cerritos, City of Commerce, City of Covina, City of Culver City, City of Diamond Bar, City of Gardena, City of Glendale, City of Glendora, City of Hawaiian Gardens, City of Hawthorne, City of Huntington Park, City of Industry, City of Irwindale, City of La Habra Heights, City of La Mirada, City of Lakewood, City of Lawndale, City of Lomita, City of Long Beach, City of Lynwood, City of Montebello, City of Monterey Park, City of Norwalk, City of Paramount, City of Pico Rivera, City of Pomona, City of Redondo Beach, City of Rosemead, City of San Dimas, City of Santa Clarita, City of Santa Fe Springs, City of Sierra Madre, City of Signal Hill, City of South El Monte, City of South Gate, City of West Covina, and City of Whittier.

[2]      Unless otherwise noted, all further statutory references are to the Revenue and Taxation Code.

[3]      A similar dispute has arisen in Fresno County.  The trial court there ruled in favor of the cities in that litigation, but appellate proceedings in that matter have been stayed pending our resolution of the present case.  (*City of Clovis v. County of Fresno*, F060148, app. pending.)

3

## II. RELEVANT FACTUAL BACKGROUND AND STATUTORY LAW

### A. The Effect of Proposition 13 on Property Tax Allocation and Administration

Counties are responsible for administering the property tax system by assessing, collecting, and allocating ad valorem property tax revenues from property owners within their borders. In general, the counties manage the property tax accounting system for the various local entities[4] within their jurisdiction and annually distribute to each entity its calculated share of property tax revenue.

Before voters passed Proposition 13 (Cal. Const., art. XIII A) in 1978, counties were permitted to set their local property tax rates at a level that fully financed their administrative costs in assessing, collecting, and allocating property taxes without charging local entities for these costs. When Proposition 13 capped property tax rates at 1 percent of assessed value, counties lost the flexibility of tailoring a dedicated funding source to fully cover their costs for this administration.

Following the passage of Proposition 13, the property tax allocation system has been governed by article 2 of chapter 6 of division 1 of the tax code, section 96 et seq., primarily sections 96.1, 96.2, and 96.5. Under these statutes, in every current fiscal year, each local entity receives property tax revenues equal to what it received in the prior year (also referred to as its base) (§ 96.1, subd. (a)(1)), plus its proportional share of any increase in revenues due to growth in assessed value within its boundaries, which is defined as the " 'annual tax increment' " (§ 96.1,

---

[4]  For simplicity, we use the term "local entities" to refer to those local agencies and jurisdictions within a county such as cities, school districts, community college districts, special districts, fire districts, or other local agencies. (See § 95, subds. (a), (b).)

subd. (a)(2); see §§ 96.2, 96.5).  The sum of these two amounts — the prior year base plus the current year's proportional share of the tax increment — becomes each jurisdiction's new base amount for the following year's calculations. (§§ 96.1, subd. (a)(1), 96.5.)  Named after the Assembly bill that originally enacted the fundamental structure of this statutory scheme, this system is commonly referred to as the "A.B. 8 allocation system," with section 96.1 as its principal statute.  (*City of Scotts Valley v. County of Santa Cruz* (2011) 201 Cal.App.4th 1, 8-9, 49.)  Under this statutory allocation system, "the proportional allocations established in the first fiscal year following the passage of Proposition 13, as modified for the following fiscal year, are perpetuated year after year, unless modified by the Legislature."  (*Id.* at p. 9.)

The Legislature did not address the funding for property tax administration until 1990, when it enacted the first statute that allowed counties to bill cities for their proportionate share of the costs of property tax administration.  (Former § 97, subd. (e), as amended by Stats. 1990, ch. 466, § 4, pp. 2043-2045; *Arcadia Redevelopment Agency v. Ikemoto* (1993) 16 Cal.App.4th 444.)  As will be discussed in greater detail *post*, the Legislature subsequently amended this provision numerous times in the early 1990's.  Relying on section 96.1 allocations as the basis of apportionment, section 95.3, as last amended in 1996 (Stats. 1996, ch. 1073, § 2, p. 7206), currently governs how a county annually apportions the costs of property tax administration among the local entities within its borders.

**B.  The Educational Revenue Augmentation Fund (ERAF)**

In 1992 and 1993, the state was in the midst of a budget crisis, and in order to meet the state's minimum guaranteed education funding requirements under

Proposition 98 (see Cal. Const., art. XVI, § 8, subd. (b)),[5] in 1992 the Legislature enacted legislation creating ERAF's in each county and shifted billions of dollars in property tax revenues from cities, counties, and other local entities into them. (Stats. 1992, ch. 700, § 4, p. 3120; *County of Sonoma v. Commission on State Mandates* (2000) 84 Cal.App.4th 1264, 1274-1275; *County of Los Angeles v. Sasaki* (1994) 23 Cal.App.4th 1442, 1452.) In 1993, the Legislature refined this legislation. (Stats. 1993, ch. 68, p. 939; Stats. 1993, ch. 566, p. 2812.) The 1992 legislation is popularly known as ERAF I; the 1993 legislation as ERAF II. The state then utilized the various ERAF's to offset contributions from the declining state General Fund in order to maintain its constitutional obligation under Proposition 98 to fund education.

The enactment of the ERAF's permanently modified the A.B. 8 allocation system by reducing the property tax base for each city and county by the amounts specified by the implementing statutes for ERAF I and ERAF II. (§§ 97.1, subds. (a)(1)-(2), 97.2, subds. (a)(1), (b)(1) & (c)(1), 97.3, subds. (a)-(c).) The permanent base shifts required by ERAF I and ERAF II became self-perpetuating for future fiscal years through the A.B. 8 process with each ERAF effectively becoming another entity receiving its share of local property tax revenues through the annual A.B. 8 allocation system.[6] (*City of Scotts Valley v. County of Santa Cruz, supra,* 201 Cal.App.4th at pp. 15-17.)

---

**5** California Constitution, article XVI, section 8, approved by the voters in 1988 as part of Proposition 98, calculates a minimum level of state funding for public schools and community colleges to be appropriated every budget year. (*White v. Davis* (2003) 30 Cal.4th 528, 542.)

**6** At least one of the ERAF I provisions, however, was a temporary shift in effect for only the 1992-1993 fiscal year. (§ 97, subds. (a), (b).)

## C. The Calculation of the Property Tax Administration Fee Under Section 95.3

Section 95.3 annually apportions the costs of property tax administration among the local entities within a county's borders. Under this statute, a county calculates an annual property tax administration fee[7] for each local entity, including cities, and that county's ERAF. This calculation is made in a manner that ensures each local entity bears a proportionate share of the county's total administrative costs based on the amount of property tax revenue allocated to each entity pursuant to section 96.1, the primary A.B. 8 allocation statute.

The annual calculation of the property tax administration fee for a city or local entity involves three steps. Pursuant to section 95.3, the county must first determine the local entity's "administrative cost apportionment factor." (§ 95.3, subd. (a).) For cities and that county's ERAF, this factor is a ratio derived by dividing the property tax revenue allocated to each local entity pursuant to section 96.1 by the total property tax revenue distributed within the county. The local entity's administrative cost apportionment factor is then multiplied by the county's total property tax administration costs from the prior year to calculate that entity's annual property tax administration fee. Finally, instead of billing the local entity for its property tax administration fee, the county simply withholds that entity's fee from the county's annual disbursement of local property tax revenue. (§ 95.3, subds. (a), (b).) Significantly, however, "those proportionate shares determined with respect to a school entity or ERAF" are exempt from any withholding to defray the county's administrative costs. (§ 95.3, subd. (b)(1).)

---

[7] This precise terminology for the county's recoupment of the costs of property tax administration is not used in any of the relevant statutes, but it is commonly referred to as the PTAF.

Because of the exemption for property tax revenues "determined with respect to a school entity or ERAF," (§ 95.3, subd. (b)(1)) counties do not recoup all of their annual costs of property tax administration and instead generally must absorb these unrecovered costs.  As we will explain, over the years the Legislature has created several programs and has made various pronouncements concerning property tax administration, but has addressed the significance of this exemption for property tax revenues allocated to ERAF's only in one narrow circumstance.

### III.  THE 2004 BUDGETARY MEASURES

In light of escalating property values in the early 2000's, property tax revenues appeared to be less volatile than other sources of tax revenue such as sales taxes and vehicle license fees.  Accordingly, in 2004, the Legislature passed Senate Bill No. 1096 (2003-2004 Reg. Sess.) which contained two different budgetary measures that again tapped local property taxes to substitute for other revenue sources.[8]

### A.  2004 — Proposition 57 and the "Triple Flip"

In 2004, the voters approved Proposition 57, the California Economic Recovery Bond Act, which allowed the state to sell up to $15 billion in bonds to close the state budget deficit.  (Gov. Code, § 99050.)  In order to create a dedicated revenue source to guarantee repayment of these bonds without raising taxes, the Legislature had passed already section 97.68, a temporary revenue measure that shifts revenue in a three-stage process known as the "Triple Flip." (Stats. 2003, 5th Ex. Sess. 2003-2004, ch. 2, § 4.1.)  In the first "flip," 0.25 percent

---

[8]    As part of the same legislative enactment, Senate Bill No. 1096 (2003-2004 Reg. Sess.) also provided for another one-time-only shift of additional property tax revenues into the county ERAF's for the 2004-2005 and 2005-2006 budget years. (Stats. 2004, ch. 211, p. 2280.)

of local sales and use tax revenues are diverted to the state for bond repayment. (§§ 97.68, subd. (b)(2), 7203.1, 7204.)  In the second "flip," the lost local sales and use tax revenues are replaced by property tax revenue that would have been placed in the county ERAF but are instead set aside in a Sales and Use Tax Compensation Fund established in each county's treasury.  (§ 97.68, subds. (a), (c)(1)-(6).)  In the final "flip," any shortfall to schools caused by the reduction of funds to the county ERAF is compensated out of the state's general fund.  This so-called "Triple Flip" is slated to end once the Recovery Act bonds are repaid. (§§ 97.68, subd. (b)(l), 7203.1; Gov. Code, § 99006, subd. (b).)

### B.  The Vehicle License Fee (VLF) "Swap"

Also in 2004, the Legislature reduced the annual vehicle license fee (VLF) from 2 percent of a vehicle's market value to 0.65 percent of market value. (Stats. 2004, ch. 211, §§ 30-31, pp. 2332-2333; see also *Guillen v. Schwarzenegger* (2007) 147 Cal.App.4th 929, 937.)  Because the VLF had been a significant source of local revenue, the Legislature passed section 97.70, also known as the "VLF Swap," which diverted property tax revenue to fully compensate each city and county for the VLF revenue that they otherwise would have received.  This diverted property tax revenue, which otherwise would have been allocated to each county's ERAF, is placed in a Vehicle License Fee Property Tax Compensation Fund established in each county's treasury, and the county then distributes the fund to each city in lieu of the lost VLF revenue.  (§ 97.70, subds. (a), (b).)

### C.  Revenue and Taxation Code Section 97.75 — The Administrative Fee-for-service Statute Regarding the Triple Flip and the VLF Swap

As part of the same legislation that created the VLF Swap and made technical corrections to the Triple Flip statute, the Legislature also enacted section

9

97.75.  (Stats. 2004, ch. 211, §§ 20.5, 21, 26, pp. 2307-2318, 2326-2327.)  The Court of Appeal in the present case relied heavily on the meaning of section 97.75 in determining whether County's calculation of the disputed property tax administration fee is lawful.

Section 97.75 reads:  "Notwithstanding any other provision of law, for the 2004-05 and 2005-06 fiscal years, a county shall not impose a fee, charge, or other levy on a city, nor reduce a city's allocation of ad valorem property tax revenue, in reimbursement for the services performed by the county under Sections 97.68 [the Triple Flip] and 97.70 [the VLF Swap].  For the 2006-07 fiscal year and each fiscal year thereafter, a county may impose a fee, charge, or other levy on a city for these services, but the fee, charge, or other levy shall not exceed the actual cost of providing these services."

In response to this legislation, the California State Association of County Auditors prepared informal guidelines to implement the Triple Flip, VLF Swap, and section 97.75.  Those guidelines, which do not have the force of law, contain a model schedule to implement the changes brought by the above described budgetary measures.  The model schedule did not change the calculation of the property tax administration fee for fiscal years 2004-2005 and 2005-2006, but beginning with fiscal year 2006-2007, the model schedule imposed a higher property tax administration fee on each city and relevant local entity.  Without explanation, the fiscal year 2006-2007 model schedule included in the cities' base those funds that would have been placed in the county ERAF, but were not deposited as a result of the Triple Flip and VLF Swap, in calculating each local entity's administrative cost apportionment factor.  This method would result in a higher property tax administration fee for each city and local entity.

Beginning in fiscal year 2006-2007, County followed the informal guidelines and no longer treated the property tax revenues diverted by the Triple

10

Flip and VLF Swap as ERAF funds exempt from the property tax administration fee. Instead, County added these diverted revenues to Cities' base for purposes of apportioning property tax administration costs. Thus, County withheld from Cities an additional $4.8 million, as property tax administration fees for fiscal year 2006-2007 and an additional $5.3 million as property tax administration fees for fiscal year 2007-2008. County's actual annual cost, however, in administering the Triple Flip and VLF Swap with regard to all 47 cities was approximately $35,000. Unless ordered by a court to do otherwise, County has stated its intention to continue to withhold the disputed property tax administration fee in the same manner in each subsequent fiscal year. We refer to County's method of calculating the fee as to those property tax revenues diverted by the Triple Flip and VLF Swap as the "disputed administration fee."

### IV. THE PARTIES' CONTENTIONS

Cities argue that section 97.75 narrowly authorizes County to charge only the $35,000 actual annual cost of "services" for administering the Triple Flip and VLF Swap and that nothing in the 2004 budgetary measures or their legislative histories dictate that those property tax revenues diverted as a result of the Triple Flip and VLF Swap can be included in property tax administration fee calculations for Cities. Cities claim that the plain language of section 97.75 does not support a broader reading that would permit the County to collect the disputed administration fee.

County argues that section 97.75 does not specifically prohibit its collection of the disputed administration fee. Instead, County argues that the Legislature's 2004 budgetary measures were intended to increase property tax administration fees because the property tax revenue diverted by the Triple Flip and VLF Swap is no longer placed in a County's ERAF, but is instead placed in a Sales and Use Tax Compensation Fund and a Vehicle License Fee Property Tax Compensation Fund

11

for use by Cities. Therefore, according to County, because the diverted property tax revenue is not placed in the county's ERAF, section 95.3 independently authorizes County's collection of the disputed administration fee. County argues this interpretation of the 2004 budgetary measures is bolstered by the Legislature's prior pronouncements explicitly recognizing that counties have been unfairly burdened with the costs of property tax administration.

## V. ANALYSIS

We conclude that the Court of Appeal correctly held that section 97.75 does not authorize County's collection of the disputed administration fee. The Court of Appeal, however, did not fully analyze the distinct issue of whether the Legislature nevertheless intended that funds diverted by the Triple Flip and VLF Swap remain exempt from a property tax administration fee, either implicitly or through section 95.3. As we explain, *post*, our review of the pertinent statutes shows that the Legislature included provisions to ensure that the 2004 budgetary measures did not alter the basic allocation of property tax revenues to local entities. Thus, in the absence of any contrary evidence we conclude that in enacting the 2004 budgetary measures, the Legislature did not intend to change the effect of the ERAF exemption from the property tax administration fee or to authorize County to add the diverted property tax revenues to Cities' allocation for purposes of distributing administrative costs.

Because the parties advance no factual dispute and the matter presents a purely legal question, we independently review the relevant statutory law. (*Professional Engineers in California Government v. Kempton* (2007) 40 Cal.4th 1016, 1032.)

12

### A. Interpreting Section 97.75 — the Fee-for-services Statute Regarding the Triple Flip and the VLF Swap

We first examine the threshold issue, whether section 97.75 authorizes County's collection of the disputed administration fee.

"The objective of statutory construction is to determine the intent of the enacting body so that the law may receive the interpretation that best effectuates that intent. [Citation.] 'We first examine the words themselves because the statutory language is generally the most reliable indicator of legislative intent. [Citation.] The words of the statute should be given their ordinary and usual meaning and should be construed in their statutory context.' [Citation.]" (*Fitch v. Select Products Co.* (2005) 36 Cal.4th 812, 818, quoting *Hassan v. Mercy American River Hospital* (2003) 31 Cal.4th 709, 715.) "If the plain, commonsense meaning of a statute's words is unambiguous, the plain meaning controls." (*Fitch, supra,* at p. 818.) "We consider extrinsic aids, such as legislative history, only if the statutory language is reasonably subject to multiple interpretations." (*Miklosy v. Regents of University of California* (2008) 44 Cal.4th 876, 888.)

We agree with the Court of Appeal that section 97.75 is not ambiguous and does not authorize County's method of calculating the disputed administration fee in light of the 2004 budgetary measures.[9]

As previously noted, section 97.75 reads: "Notwithstanding any other provision of law, for the 2004-05 and 2005-06 fiscal years, a county shall not impose a fee, charge, or other levy on a city, nor reduce a city's allocation of ad valorem property tax revenue, in reimbursement *for the services performed by the county under Sections 97.68* [*the Triple Flip*] *and 97.70* [*the VLF Swap*]. For the

---

[9]    In any event, both parties concede that nothing in the legislative history of section 97.75 is particularly helpful to either side's argument.

13

2006-07 fiscal year and each fiscal year thereafter, a county may impose a fee, charge, or other levy on a city *for these services*, but the fee, charge, or other levy shall not exceed *the actual cost of providing these services*." (Italics added.)

At issue is the interpretation of the word "services" as used in section 97.75's two sentences. If the term "services" broadly encompasses all of a county's property tax administrative duties, then this interpretation would expressly authorize County's method of calculating the disputed administration fee. But if "services" is narrowly limited to only the new, incremental costs associated with the accounting mechanisms and compensation funds created by the Triple Flip and VLF Swap, then authority for the County's method of calculating the disputed administration fee does not emanate from section 97.75. The plain language of the statute supports only the latter interpretation.

Section 97.75 refers to "services" three times, with the latter two qualifying the term as "these services." It is therefore reasonable to assume that the latter two references to "these services" refer back to the first use of the word "services" in the statute's first sentence. In that first sentence, "services" is delineated as those "performed by the county under Sections 97.68 and 97.70." Sections 97.68 and 97.70 are the implementing statutes for the Triple Flip and VLF Swap, respectively, and the only county "services" referred to in those statutes are the county auditor's creation and administration of the Sales and Use Tax Compensation Fund and the Vehicle License Fee Property Tax Compensation Fund. (§§ 97.68, subds. (c), (d), 97.70, subds. (a)-(c).)

More importantly, "services," as used in section 97.75 makes no reference to property tax administration fees, the statute governing how the property tax administration fee must be calculated (§ 95.3), or to the county administration of the property tax system as a whole. The Legislature also placed section 97.75 in the same article of the Revenue and Taxation Code as the implementing statutes

14

for the Triple Flip and VLF Swap and not under the "Definitions and Administration" article where the property tax administration fee statute, section 95.3, resides. Additionally, section 97.75's preface states that it applies "[n]otwithstanding any other provision of law . . . ." This further reinforces the conclusion that it is a stand-alone fee-for-services provision that merely authorizes counties to demand from cities payment for only the actual cost of administering the Triple Flip and VLF Swap and nothing more.

Accordingly, we conclude that section 97.75 permits a county to charge cities for only the new, incremental costs associated with a county auditor's services in administering the Triple Flip and VLF Swap.

### B. Legislative Intent and the Disputed Administration Fee

Although we have determined that section 97.75 does not authorize County to collect the disputed administration fee at issue here, this does not end our inquiry. The Court of Appeal concluded and Cities believe that if section 97.75 authorized County to bill the cities for only the additional administrative costs of implementing the Triple Flip and VLF Swap, then County also was foreclosed from collecting the disputed administration fee. But answering the issue of how County should be recompensed for its services for performing the additional administrative duties in implementing the Triple Flip and VLF Swap under section 97.75 is a separate question from the issue of County's calculation of the disputed administrative fee. The issue here is whether the Legislature intended to alter section 95.3's property tax administration fee calculations by eliminating the ERAF exemption from the property tax administration fee for those monies designated for an ERAF but diverted by the Triple Flip and VLF Swap. County posits that section 97.75 simply does not address the status of this exemption from the property tax administration fee. It reasons that in enacting the 2004 budgetary

15

measures, the Legislature intended to eliminate the exemption for the funds diverted by the Triple Flip and VLF Swap — thereby increasing administrative fees paid by cities — while at the same time enacting a mechanism to allow counties to be reimbursed for the additional administrative costs of implementing the compensation funds for the Triple Flip and VLF Swap. As County observes, these intentions would not be mutually exclusive.[10]

Accordingly, County argues, notwithstanding a narrow definition of the term "services" in section 97.75, the 2004 budgetary measures authorized its collection of the disputed administration fee under section 95.3. County contends that despite the absence of any express legislative pronouncement concerning the disputed administration fee in enacting the 2004 budgetary measures, the Legislature has, since 1990, clearly and repeatedly expressed a "pro-recoupment intent" concerning collection of the disputed administration fee. As County sees it, the 2004 budgetary measures reflected the Legislature's attempt to restore property tax administration fees to levels that existed before the creation of the exemptions applicable to property tax revenue directed to schools and the ERAF's. Furthermore, although the implementing statutes for the Triple Flip and VLF Swap do not directly refer to the property tax administration fee, County notes that the respective statutes establish that the diverted property tax revenues are never deposited into an ERAF. County reasons, therefore, that the exemption from

---

**10** We note, however, that County's past actions indicate that it initially believed that these intentions *were intended to be mutually exclusive* under section 97.75. Had County believed that the 2004 budgetary measures authorized collection of the disputed property tax administration fee, notwithstanding a narrow reading of section 97.75, it could have withheld the disputed property tax administration fee beginning with the 2004-2005 fiscal year. Instead, County did not begin withholding the disputed property tax administration fee until fiscal year 2006-2007, the year designated by section 97.75.

property tax administration fee calculations no longer applies to those funds, and that if the Legislature had intended otherwise, it would have amended section 95.3 to explicitly maintain the status quo for the exemption.

Cities assert that the Legislature expressed a "revenue-neutral" intent as to the 2004 budgetary measures that sought to maintain the status quo for total tax revenues that would be made available to both the cities and counties, and it did not intend a stealth multimillion dollar annual shift of property tax revenues from the cities to the counties. Cities argue that portions of the implementing statutes for the 2004 budgetary measures provide evidence of this revenue-neutral intent.

As explained *post*, we conclude that Cities have the better argument. Although the Legislature did not address directly the effect of the 2004 budgetary measures on the exemption status of ERAF monies diverted by the Triple Flip and VLF Swap, it did express the intent that the diversions (or adjustments) not fundamentally alter the A.B. 8 allocation system. County's withholding of the disputed administration fee is inconsistent with this intention.

*1. Sections 95.3, 97.68, 97.70, and 96.1, Read Together, Reveal a Revenue-neutral Intent*

Placing aside section 97.75, the remaining relevant statutes are the property tax administration fee statute (§ 95.3), the Triple Flip statute (§ 97.68), the VLF Swap statute (§ 97.70), and the A.B. 8 property tax revenue allocation system's principal statute (§ 96.1). The plain language of these statutes, by themselves, do not obviously address the parties' contentions concerning how the Triple Flip and VLF Swap affect the disputed administration fee. But when read together, these statutes reveal an intent that the Triple Flip and VLF Swap should not fundamentally alter the annual A.B. 8 property tax revenue allocation system. When code sections address the same matter or subject, "we must construe them together as one statute." (*City of Huntington Beach v. Board of Administration*

17

(1992) 4 Cal.4th 462, 468.)  We, therefore, will explain how these statutes, read together, maintain the basic A.B. 8 property tax revenue allocation system.

The annual A.B. 8 property tax revenue allocation system under section 96.1 requires county auditors to engage in roughly a three stage process:  (1) each entity receives a property tax revenue *base* equal to what it received in the prior year; (2) a set of statutory calculations is performed to allocate the annual tax increment, or *growth*, in assessed property value within each entity, which is added to the base; and (3) statutory *adjustments* are made before the revenues are distributed to each entity.  All three of these stages — base calculations, growth calculations, and adjustments — are part of Revenue and Taxation Code section 96.1.[11]

The property tax administration fee statute, section 95.3, bases the fee on "amounts calculated with respect to each jurisdiction, Educational Revenue Augmentation Fund (ERAF), or community redevelopment agency *pursuant to*

---

[11] Revenue and Taxation Code section 96.1 states, in relevant part:

"(a) Except as otherwise provided in Article 3 (commencing with Section 97), and in Article 4 (commencing with Section 98), for the 1980-81 fiscal year and each fiscal year thereafter, property tax revenues shall be apportioned to each jurisdiction pursuant to this section and Section 96.2 by the county auditor, subject to allocation and payment of funds as provided for in subdivision (b) of Section 33670 of the Health and Safety Code and subparagraph (D) of paragraph (3) of subdivision (g) of Section 53395.8 of the Government Code, to each jurisdiction in the following manner:

"(1) For each tax rate area, each jurisdiction shall be allocated an amount of property tax revenue equal to the amount of property tax revenue allocated pursuant to this chapter to each jurisdiction in the prior fiscal year, modified by any adjustments required by Section 99 or 99.02.

"(2) The difference between the total amount of property tax revenue and the amounts allocated pursuant to paragraph (1) shall be allocated pursuant to Section 96.5, and shall be known as the 'annual tax increment.' "

18

*Section*[] *96.1 . . . .*" (§ 95.3, subd. (a), italics added.) In turn, section 96.1 states that property tax allocations are to be made "[e]xcept as otherwise provided in Article 3 (commencing with Section 97) . . . ." (§ 96.1, subd. (a).) The statutory provisions for the current fiscal year's adjustments for the Triple Flip and VLF Swap are located in article 3. (§§ 97.68, subd. (a), 97.70, subd. (a).)

At first glance, this combination of circumstances would appear to resolve the disputed administration fee in favor of County. If the principal A.B. 8 property tax revenue allocation statute, section 96.1, incorporates the article 3 allocation adjustments for the Triple Flip and VLF Swap, then the property tax administration fee statute's reliance on those section 96.1 allocations would tend to suggest that the property tax administration fee should be calculated *after* the adjustments required by the Triple Flip and VLF Swap are applied. But the statutory provisions of the Triple Flip and VLF Swap suggest a contrary, revenue-neutral intent to maintain the status quo of A.B. 8 allocations.

First, the Triple Flip and VLF Swap contain provisions ensuring that, despite the diversions, the first stage of A.B. 8 calculations (calculating the property tax revenue *base* of cities, counties, and ERAF's) remains unchanged. Sections 97.68, subdivision (e) (Triple Flip), and 97.70, subdivision (d) (VLF Swap), provide that the amounts calculated under section 96.1 shall not reflect any property tax revenue allocation required by the Triple Flip or VLF Swap "for a preceding fiscal year."[12] This language makes clear that the prior fiscal year's

---

[12]    In its entirety, section 97.68, subdivision (e), provides: "For the 2005-06 fiscal year and each fiscal year thereafter, the amounts determined under subdivision (a) of Section 96.1, or any successor to that provision, may not reflect any portion of any property tax revenue allocation required by this section for a preceding fiscal year." Similarly, section 97.70, subdivision (d), provides: "For the 2005-06 fiscal year and each fiscal year thereafter, the amounts determined under subdivision (a) of Section 96.1, or any successor to that provision, shall not

*(footnote continued on next page)*

19

Triple Flip and VLF Swap adjustments do not enlarge a city's or county's property tax allocation base nor reduce the ERAF's property tax allocation base for that prior fiscal year, and, therefore, have no effect on the base calculations required for the current year's A.B. 8 allocation.  In essence, these subdivisions of the Triple Flip and VLF Swap preserve the status quo of the Cities', County's, and ERAF's property tax revenue base as it existed before the 2004 budgetary measures.  Thus, these entities' property tax bases continue to grow annually as they did before the 2004 budgetary measures.

Second, the Triple Flip and VLF Swap contain provisions ensuring that annual property tax revenue growth cannot be altered by the Triple Flip or VLF Swap.  Sections 97.68, subdivision (f)(3) (Triple Flip), and 97.70, subdivision (f)(3) (VLF Swap), prohibit the use of their respective statutes from altering "the manner in which ad valorem property tax revenue growth from fiscal year to fiscal year is determined or allocated in a county."

It is significant that subdivision (f)(3) of both the Triple Flip and VLF Swap statutes refers broadly to "property tax revenue growth" and not the more specific term, "tax increment," as it is defined by section 96.1, subdivision (a)(2).[13]  Additionally, given that other provisions of the Triple Flip and VLF

---

*(footnote continued from previous page)*

reflect, for a preceding fiscal year, any portion of any allocation required by this section."

[13]     Section 96.1, subdivision (a)(2) states:  "The difference between the total amount of property tax revenue [collected in the current fiscal year] and the amounts allocated pursuant to paragraph (1) [the base amount allocated in the prior fiscal year] shall be allocated pursuant to Section 96.5, and shall be known as the 'annual tax increment.' "
        Moreover, placing aside subdivision (f)(3) of both budgetary measures, nothing in the statutory provisions for the Triple Flip or VLF Swap expressly

*(footnote continued on next page)*

Swap make clear that the property tax revenue *base* of cities, counties, and ERAF's remains unchanged by these adjustments, the presence of subdivision (f)(3) in both sections 97.68 and 97.70 appears to prohibit County from using these measures to alter *any other* growth calculation in property tax revenue. Thus, reading sections 95.3, 96.1, 97.68, subdivision (e), 97.70, subdivision (d), 97.68, subdivision (f)(3), and 97.70, subdivision (f)(3) together, we discern that the Triple Flip and VLF Swap were drafted with an intent to maintain the status quo of the A.B. 8 property tax revenue allocation system and the property tax administration fee system. "Where reasonably possible, we avoid statutory constructions that render particular provisions superfluous or unnecessary." (*Dix v. Superior Court* (1991) 53 Cal.3d 442, 459.)

These circumstances strongly suggest the Legislature intended to broadly protect the status quo of property tax revenue growth. But County's withholding of the disputed administration fee appears to be inconsistent with this intention. In the absence of explicit legislative authorization, County has assigned property tax administration fees to those funds diverted by the Triple Flip and VLF Swap resulting in the annual withholding of additional millions of dollars in revenue from Cities. Thus, if the A.B. 8 allocation system in a given fiscal year grew the property tax base of Cities by allocating to them millions of dollars in tax increment, that gain would be reduced or eliminated by County's method of withholding additional property tax administration fees. Therefore, County's practice is effectively interfering with "the manner in which ad valorem property

---

*(footnote continued from previous page)*

affect the annual proportional allocation of tax increment as calculated by sections 96.5 or 96.1.

tax revenue growth from fiscal year to fiscal year is determined or allocated in a county." (§§ 97.68, subd. (f)(3), 97.70, subd. (f)(3).)

Furthermore, the existence of these measures also suggest that the Triple Flip and VLF Swap adjustments — even though they happen to be derived from property taxes — are not intended to replace the property taxes earlier diverted from Cities under the ERAF shifts of the 1990's, or in any sense as part of a city's annual share of countywide property tax revenues. Instead, the measures indicate a legislative intent to maintain the A.B. 8 allocation system as it existed following the enactments of ERAF I and ERAF II.[14] Thus, the relevant statutes do not support County's claim that the enactments of the Triple Flip and VLF Swap constitute a restoration of property tax revenues earlier lost by the ERAF I and ERAF II shifts. Because it appears the Triple Flip and the VLF Swap are solely intended to replace vehicle license fee and sales and use tax revenues that the cities have lost as a result of these budgetary devices, it is inapt to treat these article 3 adjustments as property taxes allocated to the cities for purposes of apportioning the property tax administration fee under section 95.3.

---

[14] As further evidence the Legislature intended to preserve the status quo of the ERAF I and ERAF II shifts, we note that the Triple Flip and VLF Swap statutes also contain safeguards protecting various provisions enacted with the ERAF shifts. If, in a given fiscal year, an ERAF is larger than the annual education funding requirements, the implementing statutes for the ERAF I and ERAF II shifts, under certain circumstances, return the excess ERAF funds to cities, the county, and special districts. (§§ 97.2, subd. (d)(4)(B)(i), 97.3, subd. (d)(4)(B)(i).) The Triple Flip and VLF Swap statutes make clear that these safeguards remain in effect. The statutes also preserve the effects of other provisions concerning article 4, the Tax Equity Allocation system, which allows qualifying cities to receive property tax revenues even if these cities did not receive such revenue before the passage of Proposition 13. (§§ 97.2, subd. (b)(4); 97.68, subd. (f)(1), (4), 97.70, subd. (f)(1), (4); see also *City of Scotts Valley v. County of Santa Cruz*, *supra*, 201 Cal.App.4th at pp. 9-12.)

Consequently, under the revenue-neutral principles of the Triple Flip and the VLF Swap, County should be no better, or worse, off in recouping its costs of property tax administration as a result of the adjustments required by those 2004 budgetary measures.  The calculation of Cities' property tax administration fees remains unchanged, despite the adjustments required by the Triple Flip and the VLF Swap, and County continues to absorb any proportional administrative costs attributable to property tax revenues that were first assigned to the ERAF, even if some of those revenues are eventually redirected to Cities for *other* tax revenues these 2004 budgetary measures have diverted from Cities.

### 2. *Legislative History and the Remedial Nature of the Property Tax Administration Fee Statute*

Finally, although it is true that the Legislature intended to alleviate counties' financial burden of administering the property tax system by enacting the property tax administration fee statute, we find nothing in the legislative history of section 95.3 to support County's assertion of a "pro-recoupment intent" for the collection of the disputed administration fee.

Essentially, County's argument of a long-standing "pro-recoupment intent" on the part of the Legislature, beginning with the enactment of the property tax administration fee statute in 1990, evokes the policy in favor of liberally construing a remedial statute to achieve its legislative purpose.  (*Pineda v. Williams-Sonoma Stores, Inc.* (2011) 51 Cal.4th 524, 532.)  "When the Legislature has expressly declared its intent, we must accept the declaration."  (*People ex rel. Lockyer v. R.J. Reynolds Tobacco Co.* (2005) 37 Cal.4th 707, 716.)  " ' "The mere literal construction of a section in a statute ought not to prevail if it is opposed to the intention of the legislature apparent by the statute; and if the words are sufficiently flexible to admit of some other construction it is to be adopted to effectuate that intention.  The intent prevails over the letter, and the letter will, if

23

possible, be so read as to conform to the spirit of the act." ' " (*Friends of Mammoth v. Board of Supervisors* (1972) 8 Cal.3d 247, 259, quoting *In re Haines* (1925) 195 Cal. 605, 613.)  But we find nothing in the expressly declared legislative intent aimed at the purpose advocated by County — to eliminate or to reduce the scope of the ERAF exemption for the property tax administration fee, and thereby to increase administrative fees paid by cities and other local entities.

The Legislature has made many declarations during its history of legislating property tax administration.  As noted, *ante*, in 1990, the Legislature enacted Senate Bill 2557 (1989-1990 Reg. Sess.), which amended former section 97 of the Revenue and Taxation Code, to allow counties, for the first time, to bill cities an annual property tax administration fee.  (Stats. 1990, ch. 466, § 4, p. 2043 [amending former § 97, subd. (c)]; see now § 96.1, enacted by Stats. 1994, ch. 1167, § 3, p. 6912; *Arcadia Redevelopment Agency v. Ikemoto*, *supra*, 16 Cal.App.4th 444.)  In enacting this change, the Legislature expressly recognized that since the adoption of Proposition 13, "county governments have borne an unfair and disproportionate part of the financial burden of assessing, collecting, and allocating property tax revenues for cities."  (Stats. 1990, ch. 466, § 4, p. 2045 [amending former § 97, subd. (e)(5)].)  A year later, the Legislature added a provision to exempt school and community college districts from paying their proportional share of property tax administration fees.  (Stats. 1991, ch. 333, § 3, p. 1940 [amending former § 97 subd. (g)].)

In 1992, the Legislature enacted Senate Bill No. 1559 (1992-1992 Reg. Sess.), which changed the collection of property tax administration fees from a billing system to a withholding system under which counties annually calculate and deduct each local entity's share of the property tax administration fee from that local entity's property tax revenue allocation prior to the county's disbursement.  (Stats. 1992, ch. 697, § 13, p. 3049 [amending former § 97.5,

24

subd. (d)]; see also *Arcadia Redevelopment Agency v. Ikemoto*, *supra*, 16 Cal.App.4th 444.)  In effecting this change, the Legislature again acknowledged that subsequent to the adoption of Proposition 13, counties had "borne an unfair and disproportionate" financial burden concerning property tax administration and declared that this new method of recoupment "is intended to *fairly apportion the burden of collecting property tax revenues* and is *not a reallocation of property tax revenue shares* or a transfer of any financial or program responsibility." (Stats. 1992, ch. 697, § 13, p. 3050, italics added [amending former § 97.5, subd. (d)(6)].)

But these actions and pronouncements from 1990 through 1992 did not specifically address any perceived unfairness created by the property tax administration fee statute's exemption for revenues directed to education.

As noted earlier, in 1992 and 1993, a state budget crisis resulted in the creation of the county ERAF's.  Initially, the Legislature allowed the counties to collect some property tax administration fees "with respect to a school entity," and this language apparently also covered the newly created county ERAF's. (Stats. 1992, ch. 697, § 14, pp. 3049-3050, eff. Jan. 1, 1993 [amending former § 97.5, subd. (d)(2), (3)].)  But the Legislature reinstated the full exemption for school entities less than six months later.  (Stats. 1993, ch. 66, § 35.5, pp. 925-927, eff. June 30, 1993.)  The Legislature made no declaration specifically related to this reinstatement.

In 1994, the Legislature repealed and reenacted chapter 6 of part 0.5 of division 1 of the Revenue and Taxation Code.  (Stats. 1994, ch. 1167, §§ 2, 3, p. 6906 et seq.)  It also made technical, nonsubstantive changes in light of the ERAF measures and renumbered the property tax administration fee statute, Revenue and Taxation Code section 95.3.  (Stats. 1994, ch. 1167, § 6, p. 6961.) That same year, the Legislature appropriated $25 million in state grants to counties

25

to pay for property tax administration "based on each county's share of the amount of property tax shifted to the Educational Revenue Augmentation Fund for the 1993-94 fiscal year . . . ." (Stats. 1994, ch. 139, § 2, p. 1223.) The following year, the Legislature began the State-County Property Tax Administration Loan Program, which provided loans to counties to assist in their property tax administration through the end of the 2001-2002 fiscal year.[15] (Former § 95.31, added by Stats. 1995, ch. 914, § 4, pp. 6925-6929, as amended by Stats. 1997, ch. 420, § 1, p. 2800.) With the sole exception of fiscal year 1993-1994, nothing in these programs suggested that the exemption for school entities and ERAF's created an unfair circumstance that required the Legislature's future attention.

In its 1995-1996 session, however, the Legislature considered a proposal to reimburse counties for lost property tax administration fee revenue associated with school entities and ERAF's. (Assem. Bill No. 1055 (1995-1996 Reg. Sess.) as introduced Feb. 23, 1995, § 1.) But the bill as enacted did not appropriate money to recompensate counties for lost property tax administration fee revenues as a result of the exemption for school entities and ERAF's. (Stats. 1996, ch. 1073, p. 7206.)

Instead, the legislation addressed the financial pressure being placed on counties stemming from declining property values and backlogged property assessment appeals filed by property owners by expressly including those costs in

---

[15] After this program expired by its own terms, the Legislature created the State-County Property Tax Administration Grant Program, which provided grants to counties to assist in their property tax administration through the end of the 2006-2007 fiscal year. (Stats. 2001, ch. 521, § 1, pp. 4325-4330.) But the Legislature ultimately stopped funding this program, and the counties received no grants in fiscal years 2005-2006 and 2006-2007. (Stats. 2005, ch. 38, § 2, p. 1153; Stats. 2005, ch. 39, § 27, p. 1257; Stats. 2005, ch. 74, § 80.5, p. 1484.)

26

the annual calculation of the property tax administration fee.**16** (Stats. 1996, ch. 1073, § 1, p. 7206.) The Legislature made specific findings regarding the rising costs of property tax assessment appeals, "the costs of which are required to be offset by financial assistance under state law." (*Id.* ch. 1073, § 1, subd. (d), p. 7206.) It amended section 95.3 to state: "It is the intent of the Legislature that the portion of those shares of property tax administrative costs that are calculated by the auditor for each fiscal year pursuant to subdivision (a) for school entities and the county's ERAF, *that is attributable to the county's costs in providing boards and hearing officers for the review of property tax assessment appeals*, be calculated by local officials and reimbursed by the state in the time and manner specified by a future act of the Legislature that makes an appropriation for purposes of that reimbursement." (§ 95.3, subd. (b)(2), italics added.)

Thus, the sole evidence of a pro-recoupment intent concerning the exemption for school entities and ERAF's exists only with respect to the narrow issue of the administrative costs related to property tax assessment appeals. Because the implementing statutes for the Triple Flip and VLF Swap make no similar reference to reimbursing counties for past costs in handling property tax assessment appeals, neither of those measures can be considered the "future act" anticipated by section 95.3, subdivision (b)(2), made "for purposes of that reimbursement."**17**

---

**16** The bill also made technical, nonsubstantive changes to section 95.3 by specifically listing property tax revenues directed to ERAF's as exempt from the property tax administration fee. (Stats. 1996, ch. 1073, § 1, p. 7206.)

**17** In contrast, the prior State-County Property Tax Administration Loan Program and the State-County Property Tax Administration Grant Program both expressly referred to a county's reduction of backlogged property tax assessment appeals as a criteria in maintaining a county's eligibility for the program. (§§ 95.31, subd. (b)(4)(C), 95.35, subd. (c)(4)(C).) Both programs made clear that

*(footnote continued on next page)*

In sum, nothing in the legislative history concerning the property tax administration fee negates our conclusion that the Legislature enacted the Triple Flip and VLF Swap with the intent to preserve generally the status quo of A.B. 8 allocation system. The implementing statutes of these 2004 budgetary measures suggest a revenue-neutral intent that is inconsistent with County's policy of annually withholding from Cities additional millions of dollars in property tax administration fees merely because of the adjustments required by the Triple Flip and VLF Swap. A contrary interpretation of the relevant statutes would permit the statewide multimillion-dollar annual shift of property tax revenues from the cities to the counties and would run afoul of the implementing statutes for the Triple Flip and VLF Swap which forbid interference in "the manner in which ad valorem property tax revenue growth from fiscal year to fiscal year is determined or allocated in a county." (§§ 97.68, subd. (f)(3), 97.70, subd. (f)(3).) Should the Legislature disagree with our conclusion, it of course remains free to expressly authorize a different result. (See *People v. Latimer* (1993) 5 Cal.4th 1203, 1213.)

## VI. DISPOSITION

We conclude that the Court of Appeal correctly held that section 97.75 does not authorize County's collection of the disputed administration fee, but we further conclude that the Legislature intended no change in how property tax administration fees are calculated under section 95.3 and that ERAF monies diverted by the Triple Flip and VLF Swap remain exempt from the property tax

---

*(footnote continued from previous page)*

any loan or grant given to a county could not result in any change to the property tax administration fees withheld under section 95.3. (§§ 95.31, subd. (e), 95.35, subd. (i).) Therefore, these programs actually reinforced the existing apportionment of the property tax administration fee between cities and counties.

administration fee. Therefore, the County's method of calculating property tax administration fees violates the statutory scheme.

For the reasons discussed above, the Court of Appeal's judgment is affirmed.

CANTIL-SAKAUYE, C. J.

WE CONCUR:

KENNARD, J.
BAXTER, J.
WERDEGAR, J.
CHIN, J.
CORRIGAN, J.
LIU, J.

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion** City of Alhambra v. County of Los Angeles

_____

**Unpublished Opinion**
**Original Appeal**
**Original Proceeding**
**Review Granted** XXX 186 Cal.App.4th 537
**Rehearing Granted**

_____

**Opinion No.** S185457
**Date Filed:** November 19, 2012

_____

**Court:** Superior
**County:** Los Angeles
**Judge:** James C. Chalfant

_____

**Counsel:**

Colantuono & Levin, Michael G. Colantuono and Holly O. Whatley for Plaintiffs and Appellants.

Jarvis, Fay, Doporto & Gibson, Benjamin P. Fay and Rick W. Jarvis for League of California Cities as Amicus Curiae on behalf of Plaintiffs and Appellants.

Greenberg Traurig, Scott D. Bertzyk, Karin L. Bohmholdt; Raymond G. Fortner, Jr., and Andrea Sheridan Ordin, County Counsel, and Thomas M. Tyrrell, Deputy County Counsel, for Defendants and Respondents.

Jennifer B. Henning for California State Association of Counties as Amicus Curiae on behalf of Defendants and Respondents.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

Michael G. Colantuono
Colantuono & Levin
300 South Grand Avenue, Suite 2700
Los Angeles, CA  90071-3137
(213) 542-5700

Scott D. Bertzyk
Greenberg Traurig
2450 Colorado Avenue, Suite 400E
Santa Monica, CA  90404
(310) 586-7700