Filed 5/27/20

CERTIFIED FOR PUBLICATION


IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| CITY OF CHULA VISTA et al., | C080711 |
| Plaintiffs and Respondents, | (Super. Ct. No. 34-2014-80001723-CU-WM-GDS) |
| v. | |
| TRACY SANDOVAL, as Auditor-Controller, etc., | |
| Defendant and Appellant; | |
| SOUTHWESTERN COMMUNITY COLLEGE DISTRICT et al., | |
| Real Parties in Interest and Appellants. | |

APPEAL from a judgment of the Superior Court of Sacramento County, Michael P. Kenny, Judge.  Reversed with directions.

Thomas E. Montgomery, County Counsel, Thomas D. Bunton, Assistant County Counsel, William A. Johnson, Jr., and Rachel H Witt, Senior Deputy County Counsel, for Defendant and Appellant.

Winet Patrick Gayer Creighton & Hanes, Randall L. Winet, Kennett L. Patrick and Amanda F. Benedict for Real Parties in Interest and Appellants.

Colantuono, Highsmith & Whatley, Michael G. Colantuono, Holly O. Whatley and Matthew T. Summers for Plaintiffs and Respondents.

1

Jarvis, Fay, Doporto & Gibson and Benjamin P. Fay; Angil P. Morris-Jones, City Attorney for City of National City as Amicus Curiae on behalf of Plaintiffs and Respondents.

Sharon L. Anderson, County Counsel, and Rebecca J. Hooley, Deputy County Counsel for Contra Costa County as Amicus Curiae.

In the wake of a government fiscal crisis, the Legislature dissolved over 400 redevelopment agencies and redistributed the former tax increment generated by redevelopment between local taxing entities. This case is primarily a fight between the tax entities who negotiated favorable passthrough agreements before their redevelopment agencies were dissolved, and those who did not, for their pro rata share of the residual pool of money in the redevelopment property tax fund left for distribution after the successor agencies first paid the passthrough agreements in full, enforceable obligations, and administrative costs.

Seven cities filed a petition for a writ of mandate and a complaint for declaratory relief against Tracy Sandoval, the auditor-controller for the County of San Diego (Auditor) challenging the methodology the Auditor used to distribute the residual pool of former tax increment, a method that favored San Diego County and, at least, three community college districts, all of whom had passthrough agreements with their former redevelopment agencies. The trial court agreed with the petitioner cities and granted their petition. Auditor appeals.[1] The Contra Costa County auditor-controller filed an amicus

---

[1] The petitioner cities (Cities) include: Chula Vista, El Cajon, Escondido, Poway, San Diego, San Marcos, and Vista. There are a number of real parties in interest including school districts, water districts, cemetery districts, special districts, healthcare districts, a conservation district, a flood control district, the county office of education, the county water authority, and an irrigation district. Three real parties in interest, Southwestern Community College District, San Diego Community College District, and Palomar Community College District joined the Auditor in appealing the judgment granting the petition for a writ of mandate.

2

brief raising constitutional challenges that had not been squarely addressed by the parties.[2]  Meanwhile, according to the parties, county auditors throughout the state, charged with dispersing former tax increment, have chosen three different interpretations of the applicable statutes, Health and Safety Code sections 34183 and 34188.[3]

This is a hard and confusing case involving the statutory construction of two ambiguous statutes, made even more difficult by a later amendment "clarifying" the legislative intent.  As amicus curiae points out, this is not a moral narrative.  Speculation

---

[2] We will not resolve the constitutional challenge because amicus curiae " ' "must accept the issues made and propositions urged by the appealing parties, and any additional questions presented in a brief filed by an amicus curiae will not be considered." ' " (*Younger v. State of California* (1982) 137 Cal.App.3d 806, 813-814; *California Assn. for Safety Education v. Brown* (1994) 30 Cal.App.4th 1264, 1275.)  Moreover, the California Supreme Court shunned consideration of additional constitutional challenges in *California Redevelopment Assn. v. Matosantos* (2011) 53 Cal.4th 231, 268, footnote 18 (*Matosantos*).

In the same vein, Cities urge us to either strike those portions of the Auditor's reply brief also raising, for the first time, constitutional concerns, to ignore those arguments, or to allow a surreply.  We agree with Cities that the constitutional arguments have been raised too late for a substantive determination of their merits.  We, therefore, have ignored the arguments raised for the first time in reply.  We reject the Auditor's contention that Cities' reference to the two-thirds requirement in discussing the legislative history of Health and Safety Code section 34188 did not squarely present the arguments later raised by amicus curiae and the Auditor in its reply brief.  Constitutional scrutiny of the depth the parties, either inappropriately or belatedly, suggest must await another case in which the issues are properly raised in the trial court, thoroughly examined, and definitively resolved.  Late in the opinion we provide a superficial peek into the looming constitutional issues only to bolster our conclusion that Assembly Bill No. 1484 (2011-2012 Reg. Sess.) conflicts with the purpose and plain language of Health and Safety Code section 34188 and to conclude otherwise casts doubt on the constitutionality of the methodology the Cities urge us to adopt.

[3] Further undesignated statutory references are to the Health and Safety Code.

3

about the motives of the players is both irrelevant and unhelpful.**4** Cognizant that the Legislature is hamstrung by a complicated maze of voter approved initiatives, we must ascertain how the legislators intended auditor-controllers to distribute residual funds.

We conclude there is no plain meaning to be attributed to inconsistent statutory language. We are nonetheless compelled to construe the mangled statutes as we find them and offer direction to auditor-controllers throughout the state. We accept nearly all of Cities' contentions including, most importantly, their premise that the fundamental purpose of section 34188, was to include passthrough payments as part of a taxing entity's Assembly Bill No. 8 (1977-1978 Reg. Sess.) (Assembly Bill 8) pro rata share and thereby equalize the tax distributions to those taxing entities with favorable passthrough agreements and those without. The sole issue before us is one of statutory construction. We accept Cities' interpretation of the language of section 34188 and how the language is consistent with its legislative history. And we agree that for all its significance on a constitutional issue we do not address, this court's decision in *City of Cerritos v. State of California* (2015) 239 Cal.App.4th 1020 (*Cerritos*), does not resolve any of the statutory construction problems, particularly involving passthrough payments, we confront here.

---

**4** Real parties in interest, the three community college districts, introduced evidence at trial attempting to prove that school districts would fare better under the Auditor's methodology. The trial court excluded the evidence as irrelevant. Yet, Cities argue, the school districts have attempted to slip in the same evidence in their reply, a tactic we should deflect by striking their reply. The school districts insist they are not attempting to reintroduce evidence shunned by the trial court, but have included a chart and argument to rebut the Cities' contention that its methodology will benefit schools. We agree with Cities that the evidence, excluded at trial, is not properly considered on appeal. (*Shaw v. County of Santa Cruz* (2008) 170 Cal.App.4th 229, 282.) Because we are confronted by a question of statutory construction, a question of law, who will win financially and who will lose, is not relevant. We will ignore any portions of the reply that incorporate evidence excluded at trial but have applied the same standard and will also ignore the Cities' calculations as to how much money they would recoup under the trial court's methodology.

4

But those are small Pyrrhic victories for Cities because the very rules of statutory construction Cities espouse ultimately preclude us from finding in their favor.

Compelled, as we are, by the inherent conflict between section 34188 and Assembly Bill No. 1484 (Assembly Bill 1484), we must reverse the trial court's judgment granting Cities' petition for a writ of mandate. Cities appear to recognize it is Assembly Bill 1484 that is the real culprit. Indeed, Assembly Bill 1484 is the sole obstacle to harmonizing the statutes in a manner that would cap trust fund distributions at a taxing entity's Assembly Bill 8 pro rata share. Nevertheless, Assembly Bill 1484 cannot be ignored or harmonized and, because it demands that passthrough payments be paid in full, it conflicts with section 34188's proportionate distribution scheme. The ultimate remedy, of course, resides with the Legislature to decide whether the amount of passthrough payments made to taxing entities should affect their proportionate share of the residual moneys left in the trust fund, and if so, to amend the statutes within the parameters allowed by Proposition 1A (approved by the voters, Gen. Elec. (Nov. 2, 2004)) and Proposition 22 (approved by the voters, Gen. Elec. (Nov. 2, 2010)).

## BACKGROUND

### The Voters, the Legislature, and Budgetary Woes

The story of the statutes before us was recounted by the Supreme Court in *Matosantos, supra*, 53 Cal.4th 231. The critical part of the story begins in 1978 with the voters' passage of Proposition 13 (approved by the voters, Primary Elec. (June 6, 1978)), an event of "seismic significance." (*Matosantos*, at p. 244.) Prior to 1978, cities and counties levied their own property taxes. But "Proposition 13 capped ad valorem real property taxes imposed by all local entities at 1 percent (Cal. Const., art. XIII A, § 1, subd. (a)), reducing the amount of revenue available by more than half." (*Matosantos*, at p. 244.) Proposition 13 failed, however, to specify a method of allocating the property taxes collected and, as a result, it "largely transferred control over local government finances from the state's many political subdivisions to the state, converting the property

5

tax from a nominally local tax to a de facto state-administered tax subject to a complex system of intergovernmental grants." (*Matosantos*, at p. 244.) As a consequence, Proposition 13 "created a zero-sum game in which political subdivisions (cities, counties, special districts, and school districts) would have to compete against each other for their slices of a greatly shrunken pie." (*Matosantos*, at pp. 244-245.)

The Legislature thereafter created an allocation system, commonly referred to as the "A.B. 8" allocation system wherein these political subdivisions or taxing entities receive their Assembly Bill 8 pro rata shares. Under "article 2 of chapter 6 of part 0.5 of division 1 of the Revenue and Taxation Code, section 96 et seq., primarily sections 96.1, 96.2, and 96.5 . . . in every current fiscal year, each local entity receives property tax revenues equal to what it received in the prior year (also referred to as its base) ([Rev. & Tax. Code, ]§ 96.1, subd. (a)(1)), plus its proportional share of any increase in revenues due to growth in assessed value within its boundaries, which is defined as the ' "annual tax increment" ' ([Rev. & Tax. Code, ]§ 96.1, subd. (a)(2); see [Rev. & Tax. Code, ]§§ 96.2, 96.5). The sum of these two amounts—the prior year base plus the current year's proportional share of the tax increment—becomes each jurisdiction's new base amount for the following year's calculations. ([Rev. & Tax. Code, ]§§ 96.1, subd. (a)(1), 96.5.) . . . [Citation.] Under this statutory allocation system, 'the proportional allocations established in the first fiscal year following the passage of Proposition 13, as modified for the following fiscal year, are perpetuated year after year, unless modified by the Legislature.' [Citation.]" (*City of Alhambra v. County of Los Angeles* (2012) 55 Cal.4th 707, 713.)

Proposition 98 (approved by the voters, Gen. Elec. (Nov. 8, 1988)), placed additional pressure on state coffers. Adding article XVI, section 8 to the state Constitution, the voters established a "constitutional minimum funding level for education and required the state to designate a portion of the General Fund for public schools." (*Cerritos, supra*, 239 Cal.App.4th at p 1039.) When the Legislature was faced

6

with a fiscal crisis in the early 1990's, it apportioned property taxes by reducing the property tax allocation to cities, counties, and special districts.  (*Id.* at p. 1040.)  Redevelopment agencies could not levy taxes but instead relied on tax increment financing, the tax increment created by the increased value of redevelopment project area property, a funding method authorized by article XVI, section 16 of the state Constitution and section 33670 of the Health and Safety Code.

Playing center stage in the present drama are "passthrough agreements."  Before 1994, section 33401 allowed taxing entities to negotiate passthrough contracts with a redevelopment agency to offset redevelopment's fiscal impact.  Section 33401 provided: "The agency may in any year during which it owns property in a redevelopment project that is tax exempt pay directly to any city, county, city and county, district, including, but not limited to, a school district, or other public corporation for whose benefit a tax would have been levied upon the property had it not been exempt, an amount of money in lieu of taxes that may not exceed the amount of money the public entity would have received if the property had not been tax exempt."  The redevelopment agency would "pass through" a share of the tax increment from a project area to the taxing entity.  Redevelopment plans adopted after January 1, 1994, were subject to mandatory statutory passthrough payments.  (§ 33607.5.)

In 2004 the electorate adopted Proposition 1A and added section 25.5 of article XIII of the California Constitution providing in part:  "On or after November 3, 2004, the Legislature shall not enact a statute to do any of the following:  [¶] . . . [¶] . . . (3) change for any fiscal year the pro rata shares in which ad valorem property tax revenues are allocated among local agencies in a county other than pursuant to a bill passed in each house of the Legislature by rollcall vote entered in the journal, two-thirds of the membership concurring . . . ."  (Cal. Const., art. XIII, § 25.5, subd. (a).)  "Proposition 1A was intended to prevent the Legislature from statutorily reducing the existing allocations

7

of property taxes among cities, counties, and special districts . . . to satisfy the State's school funding obligations." (*Cerritos, supra*, 239 Cal.App.4th at p. 1041.)

And in 2010 the voters passed yet another constitutional amendment to stop the state from raiding local governments' tax revenue "placing local tax revenues off limits to the Legislature." (*City of Bellflower v. Cohen* (2016) 245 Cal.App.4th 438, 445.) A key portion of the initiative is set forth in section 24 of article XIII of the California Constitution, which provides: "The Legislature may not reallocate, transfer, borrow, appropriate, restrict the use of, or otherwise use the proceeds of any tax imposed or levied by a local government solely for the local government's purposes." (Cal. Const, art. XIII, § 24, subd. (b).) The purpose of Proposition 1A "is simply to explain that the Legislature had been requiring the transfer of redevelopment agency tax increment, and that Proposition 22 was intended to eliminate future transfers: 'The Legislature has been illegally circumventing Section 16 of Article XVI in recent years by requiring redevelopment agencies to transfer a portion of those taxes for purposes other than the financing of redevelopment projects. A purpose of the amendments made by this measure is to prohibit the Legislature from requiring, after the taxes have been allocated to a redevelopment agency, the redevelopment agency to transfer some or all of those taxes to the State, an agency of the State, or a jurisdiction; or to use some or all of those taxes for the benefit of the State, an agency of the State, or a jurisdiction.' (Prop. 22, Gen. Elec. (Nov. 2, 2010) § 9.)" (*Matosantos, supra*, 53 Cal.4th at p. 259, fn. 13.)

The fiscal pressure on local entities persisted. Indeed, " 'Proposition 13 created a kind of shell game among local government agencies for property tax funds. The only way to obtain more funds was to take them from another agency. Redevelopment proved to be one of the most powerful mechanisms for gaining an advantage in the shell game.' [Citation.]" (*Matosantos, supra*, 53 Cal.4th at p. 247.) The temptation to use redevelopment as a weapon proved irresistible in many cities and by 2011 redevelopment

8

agencies received 12 percent of all property tax revenue in the state. (*Ibid*.) And then suddenly they were all dissolved.

**Moving Money and Dissolving Redevelopment Agencies**

Facing a projected $25 billion operating deficit and sitting in a landmine of voter approved constitutional limitations on its ability to maneuver, the Legislature in 2011 dissolved all redevelopment agencies (§ 34172) and transferred control of redevelopment agency assets to successor agencies. "Part 1.85 requires successor agencies to continue to make payments and perform existing obligations. (§ 34177.) However, unencumbered balances of redevelopment agency funds must be remitted to the county auditor-controller for distribution to cities, the county, special districts, and school districts in proportion to what each agency would have received absent the redevelopment agencies. (See §§ 34177, subd. (d), 34183, subd. (a)(4), 34188.) Proceeds from redevelopment agency asset sales likewise must go to the county auditor-controller for similar distribution. (§ 34177, subd. (e).) Finally, tax increment revenues that would have gone to redevelopment agencies must be deposited in a local trust fund each county is required to create and administer. (§§ 34170.5, subd. (b), 34182, subd. (c)(1).) All amounts necessary to satisfy administrative costs, pass-through payments, and enforceable obligations will be allocated for those purposes, while any excess will be deemed property tax revenue and distributed in the same fashion as balances and assets. (§§ 34172, subd. (d), 34183, subd. (a).)" (*Matosantos, supra*, 53 Cal.4th at p. 251.)

County auditor-controllers play a pivotal role in winding down the redevelopment agencies. (§§ 34182-34188.) One of their many new responsibilities is to administer trust funds from which payments and distributions are made pursuant to sections 34183 and 34188, the statutes at the heart of this appeal.

9

**The Key Statutes**

Section 34183 establishes the priority in which the county auditor-controller must allocate the revenue from the trust fund. The parties refer to section 34183's priorities as a "waterfall." Section 34183 provides in relevant part:

"(a) Notwithstanding any other law, from February 1, 2012, to July 1, 2012, and for each fiscal year thereafter, the county auditor-controller shall, after deducting administrative costs allowed under Section 34182 and **Section 95.3 of the Revenue and Taxation Code**, allocate moneys in each Redevelopment Property Tax Trust Fund as follows:

"(1)(A) Subject to any prior deductions required by subdivision (b), first, the county auditor-controller shall remit from the Redevelopment Property Tax Trust Fund to each local agency and school entity an amount of property tax revenues in an amount equal to that which would have been received under Section 33401, 33492.140, 33607, 33607.5, 33607.7, or 33676, as those sections read on January 1, 2011, or pursuant to any passthrough agreement between a redevelopment agency and a taxing entity that was entered into prior to January 1, 1994, that would be in force during that fiscal year, had the redevelopment agency existed at that time. The amount of the payments made pursuant to this paragraph shall be calculated solely on the basis of passthrough payment obligations, existing prior to the effective date of this part and continuing as obligations of successor entities, shall occur no later than May 16, 2012, and no later than June 1, 2012, and each January 2 and June 1 thereafter. . . . [¶] . . . [¶]

"(2) Second, on June 1, 2012, and each January 2 and June 1 thereafter, to each successor agency for payments listed in its Recognized Obligation Payment Schedule for the six-month fiscal period beginning January 1, 2012, and July 1, 2012, and each January 2 and June 1 thereafter . . . . [¶] . . . [¶]

"(3) Third, on June 1, 2012, and each January 2 and June 1 thereafter, to each successor agency for the administrative cost allowance, as defined in Section 34171, for

10

administrative costs set forth in an approved administrative budget for those payments required to be paid from former tax increment revenues.

"(4) Fourth, on June 1, 2012, and each January 2 and June 1 thereafter, any moneys remaining in the Redevelopment Property Tax Trust Fund after the payments and transfers authorized by paragraphs (1) to (3), inclusive, shall be distributed to local agencies and school entities in accordance with Section 34188. . . . [¶] . . . [¶]

"(d) The Controller may recover the costs of audit and oversight required under this part from the Redevelopment Property Tax Trust Fund by presenting an invoice therefor to the county auditor-controller who shall set aside sufficient funds for and disburse the claimed amounts prior to making the next distributions to the taxing entities pursuant to Section 34188. . . ."  (§ 34183, subds. (a)-(d).)

While section 34183 establishes the order in which the revenues in the trust fund must be paid, section 34188 dictates that all distributions must be proportionate to the tax entity's Assembly Bill 8 pro rata share.  The parties agree, and the trial court found, that the proportionate "share" referred to in section 34188 is the taxing entity's "AB 8 share." The pertinent part of section 34188 reads:

"For all distributions of property tax revenues and other moneys pursuant to this part, the distribution to each taxing entity shall be in an amount proportionate to its share of property tax revenues in the tax rate area in that fiscal year, as follows:

"(a) (1) For distributions from the Redevelopment Property Tax Trust Fund, the share of each taxing entity shall be applied to the amount of property tax available in the Redevelopment Property Tax Trust Fund after deducting the amount of any distributions under paragraphs (2) and (3) of subdivision (a) of Section 34183.

"(2) For each taxing entity that receives passthrough payments, that agency shall receive the amount of any passthrough payments identified under paragraph (1) of subdivision (a) of Section 34183, in an amount not to exceed the amount that it would receive pursuant to this section in the absence of the passthrough agreement.  However,

11

to the extent that the passthrough payments received by the taxing entity are less than the amount that the taxing entity would receive pursuant to this section in the absence of a passthrough agreement, the taxing entity shall receive an additional payment that is equivalent to the difference between those amounts." (§ 34188, subd. (a)(1)-(2).)

The Legislature dissolved the redevelopment agencies, but established a mechanism for the payment of the former agencies' obligations. Section 34172, subdivision (d) states: "Revenues equivalent to those that would have been allocated pursuant to subdivision (b) of Section 16 of Article XVI of the California Constitution shall be allocated to the Redevelopment Property Tax Trust Fund of each successor agency for making payments on the principal of and interest on loans, and moneys advanced to or indebtedness incurred by the dissolved redevelopment agencies. Amounts in excess of those necessary to pay obligations of the former redevelopment agency shall be deemed to be property tax revenues within the meaning of subdivision (a) of Section 1 of Article XIII A of the California Constitution."

According to Auditor, a working group of county auditors convened to decipher the meaning of sections 34183 and 34188. They could not reach a consensus on what methodology to use to distribute the residual pool of money described in section 34183, subdivision (a)(4) in the proportionate shares directed by section 34188, subdivision (a)(1). Auditor adopted the methodology advocated by the Department of Finance. Cities resisted this construction of the statutes and the trial court applied Cities' alternative methodology. A third methodology, adopted by amicus curiae Contra Costa County auditor-controller is not before us.

After the internal inconsistency of the two statutes was brought to its attention, the Legislature attempted to clarify its intent. Assembly Bill 1484 states: "The Legislature finds and declares as follows:

"(a) Certain provisions of Assembly Bill 26 of the 2011-12 First Extraordinary Session of 2011 (Ch. 5, 2011-12 First Ex. Sess.) are internally inconsistent, or uncertain

12

in their meaning, with regard to the calculation of the amount to be paid by a county auditor-controller from the Redevelopment Property Tax Trust Fund to meet passthrough payment obligations to local agencies and school entities.

"(b) Consistent with the statement in Section 34183 of the Health and Safety Code, as added by the measure identified in subdivision (a), that the provisions of that section are to apply '[n]otwithstanding any other law,' it was the intent of the Legislature in enacting that measure that the amount of the passthrough payments that are addressed by that section be determined in the manner specified by paragraph (1) of subdivision (a) of Section 34183 of the Health and Safety Code, and that the amount so calculated not be reduced or adjusted pursuant to the operation of any other provision of that measure." (Stats. 2012, ch. 26, § 36.)

**The San Diego Auditor's Methodology**

First, Auditor deducts her administrative costs from the trust. Second, she determines the amount of passthrough payments due to a taxing entity and the payments are remitted directly. The parties agree that the passthrough payments must be paid in full. Auditor contends that section 34188 does not limit the amount of revenue a taxing entity can receive, but she implements a cap nonetheless based on the principle that a taxing entity should not receive more than it would have received in the absence of redevelopment.

An entity's cap, in Auditor's view, is based on its Assembly Bill 8 pro rata share of the entire amount of monies in the trust fund before any distributions for passthrough payments, enforceable obligations, administrative costs, and invoices from the state controller's office for audit and oversight are paid and deducted. The trial court described Auditor's calculation this way: "The amount of residual allocated to an affected taxing entity, when added to any passthrough received by the entity, cannot exceed the amount equal to the affected taxing entity's Fund Impact Ratio (AB 8 Share) of property tax revenues multiplied by the total amount of the [trust] for that

13

distribution." Since Auditor's cap is set high, more taxing entities, including the County of San Diego and the three community college districts, are paid their Assembly Bill 8 pro rata share in full. If, however, an entity's passthrough payments when added to its pro rata share of the residual, exceeds the cap, the portion of the residual monies that exceeds the cap is reallocated to other taxing entities in proportion to their relative Assembly Bill 8 shares.

**The Trial Court's Methodology**

The court, like both parties, accepted the notion that there should be a limit or "cap" on the amount of revenues a taxing entity could receive from the trust. But unlike Auditor, the court found that the cap was statutorily required. "The Court finds that the first paragraph of section 34188 creates a proportionate share directive to auditor-controllers that residual distributions not exceed each entity's property tax allocation (hereinafter referred to as the 'AB 8 share'). The directing language is, 'the distribution to each taxing entity shall be in an amount proportionate to its share of property tax revenues in the tax rate area in that fiscal year. . . .' "

The court recognized, however, that the cap was not the essence of the parties' disagreement. Rather the disagreement was "how to calculate the amount each entity is entitled to receive based on their proportionate share of the [trust] residue." The court concluded that the plain language of section 34188 required a two-step calculation—first a calculation of what the trial court characterized as the entity's "entitlement share" and a second calculation for the actual distribution of available funds.

The court explained: "Section 34188[, subd. ](a)(1) requires the residual calculations to be done using 'the amount of property tax available in the Redevelopment Property Tax Trust Fund after deducting the amount of any distributions under paragraphs (2) and (3) of subdivision (a) of Section 34183.' Consequently, each taxing entity's entitlement share is to be calculated after deducting enforceable obligation payments and successor administrative cost allowances. Section 34188[, subd. ](a)(1)

14

does not call for the entitlement share calculation to be performed using the actual residual amount, but instead, to consider the amount of property tax available in the [trust], minus those amounts distributed pursuant to subsections 9(a)(2) and (a)(3) of section 34183."

The court further explained the actual distribution calculation. "When the actual distribution is made, the passthrough amounts are not included, however their consideration in the entitlement calculation ensures that each entity can receive up to its proportionate share of property tax revenues from the passthrough and residual amounts. If the Legislature had wanted to exclude the passthrough amounts from the entitlement share calculation, they would have included such language. The exclusion of subsections (2) and (3) from the calculation indicates that the amounts not listed -- the passthrough amounts and the actual residual -- are to be *included* in the entitlement calculation. As passthrough payments were designed to provide a replacement for tax increment payments, pursuant to section 33401, their inclusion in the entitlement share calculation ensures that those entities not receiving passthrough payments will not have their entitlement shares unfairly reduced." (Fn. omitted.)

The parties are at odds as to what constitutes property tax revenues. Whereas Auditor premises her analysis on a finding that passthrough payments are obligations of the successor agencies and do not constitute property tax revenues, Cities assert passthrough payments do constitute property tax revenues. The distinction is important in determining whether or not passthrough payments should be included in the pool of money to be distributed, and therefore, in calculating the size of the pool of money against which the taxing entities' Assembly Bill 8 pro rata share should be applied.

**The Arguments**

We begin with the glaring problem at the center of this case—sections 34183 and 34188 are ambiguous, at best, and fatally inconsistent, at worst. The Legislature itself characterized the two statutes as internally inconsistent, but the purported remedy,

15

Assembly Bill 1484, only compounds the confusion. The arguments, as we understand them, can be synthesized as follows.

Auditor offers a logical, straightforward argument focused primarily on section 34183. Pursuant to section 34183, she asserts she must remit passthrough payments (subd. (a)(1)), enforceable obligations (subd. (a)(2)), and administrative costs (subd. (a)(3)). All three categories, she contends, constitute obligations she must pay in the order of priority established by the statute; they are not property tax revenue to be distributed. Thus, once they are remitted as section 34183 directs, they are not "available" in the trust fund for distribution pursuant to subdivision (a)(2) and (3). After the obligations are paid, the residual moneys left in the pool are then distributed to the taxing entities according to their Assembly Bill 8 shares as compelled by section 34188, subdivision (a)(1). The net effect of Auditor's analysis is that those entities which have favorable passthrough agreements are paid in full and can also receive a proportionate amount of the residual pool of money left after the obligations, including passthrough agreements, are paid. Passthrough agreements are treated like an enforceable obligation and the recipients of passthrough payments are entitled to receive the benefit of their bargains as well as their Assembly Bill 8 share of the residual. All the parties agree that, pursuant to Assembly Bill 1484, passthrough payments, whether contractual or statutory, are to be paid in full. Auditor points out that it was primarily cities that benefited from the diversion of tax increment to fund redevelopment and, thus, it is not inequitable for other entities who were disadvantaged during the heyday of redevelopment to continue to recap their passthrough payments.

Cities object to Auditor's methodology. In their view, the dispositive statute is section 34188, not section 34183. Section 34183 establishes the priority in which obligations are to be paid, and if there is money left over, the residual is to be distributed. But Cities insist that Auditor ignores the specific directive the Legislature provides in section 34188, subdivision (a)(1): "For distributions from the Redevelopment Property

16

Tax Trust Fund, the share of each taxing entity shall be applied to the amount of property tax available in the Redevelopment Property Tax Trust Fund after deducting the amount of any distributions under paragraphs (2) and (3) of subdivision (a) of Section 34183." In other words, the Legislature has redefined the size of the pie. Whereas Auditor seeks to include passthrough payments, enforceable obligations, administrative costs, and the residual moneys in the gross amount of money in the trust fund to be distributed, Cities argue the Legislature has limited the size of the money to be distributed to include the passthrough payments and the residual moneys only.

The trial court agreed with Cities. At the hearing on the petition for writ of mandate, the court asked counsel for Auditor on multiple occasions how her methodology took the section 34188 directive to include passthrough payments into account. Counsel assured the court that, as a matter of policy, not legal restraint, the controller's office would not distribute any residual moneys in excess of the entity's Assembly Bill 8 share, including the passthrough payments. In its ruling on the submitted matter, the court rejected Auditor's position and held that section 34188 compelled a proportionate allocation of the residual moneys including the amount of the passthrough payments. The court explained: "Section 34188[, subd. ](a)(1) requires the residual calculations to be done using 'the amount of property tax available in the Redevelopment Property Tax Trust Fund after deducting the amount of any distributions under paragraphs (2) and (3) of subdivision (a) of Section 34183.' Consequently, each taxing entity's entitlement share is to be calculated after deducting enforceable obligation payments and successor administrative cost allowances. Section 34188[, subd. ](a)(1) does not call for the entitlement share calculation to be performed using the actual residual amount, but instead, to consider the amount of property tax available in the [trust], minus those amounts distributed pursuant to subsections (a)(2) and (a)(3) of section 34183. This requires the passthrough payment amounts to be combined with

17

what constitutes the actual residual for purposes of calculating the funds available for distribution in satisfaction of each entity's AB 8 share."

The Legislature's objective, according to the trial court, was to ensure that each entity can receive up to its proportionate share of property tax revenues from the passthrough and residual amounts. The court explained: "As passthrough payments were designed to provide a replacement for tax increment payments, pursuant to section 33401, their inclusion in the entitlement share calculation ensures that those entities not receiving passthrough payments will not have their entitlement shares unfairly reduced." A more equitable allocation of tax increment, consistent with a proportionate Assembly Bill 8 share allocation, results from the trial court's findings, a calculation consistent with Cities' position on appeal. Thus, where Auditor's argument is premised on the primacy of the passthrough payments as a contractual or statutory right to be given priority, Cities' argument is premised on the primacy of the Assembly Bill 8 proportionate share distribution of tax increment.

A major wrinkle in Cities' argument is Assembly Bill 1484's purported "clarification" of legislative intent. Acknowledging that the interplay between sections 34183 and 34188 was inconsistent, the Legislature directed county auditor-controllers to make all passthrough payments in full. But the legislative clarification creates a more vexing problem, potentially of constitutional significance. If a taxing entity's passthrough payment exceeds its Assembly Bill 8 share, the residual will have to be reallocated and other entities' proportionate Assembly Bill 8 shares will have to be reduced. The constitutional issues, however, as noted above are not before us.

We have before us an appeal of a writ of mandate, which the parties agree, turns on the interpretation of the redevelopment dissolution statutes. Where the duty of a public official under a statute presents an issue of statutory construction on undisputed facts, the question is one of law and the standard of review is de novo. (*Marshall v. Pasadena Unified School Dist*. (2004) 119 Cal.App.4th 1241, 1253.)

18

## DISCUSSION

## I

### *The Problem the Statutory Language Creates*

Section 34183 is not the problem. Section 34183 clearly prioritizes all distributions from the trust fund. Passthough payments are made and enforceable obligations and administrative costs are paid. The pot of money then remaining in the trust, according to the express terms of section 34183, is to be distributed "to local agencies and school entities in accordance with Section 34188." (§ 34183, subd. (a)(4).)

The problem is section 34188 and what is left of it following the amendment contained in the uncodified language of Assembly Bill 1484. The first iteration of section 34188 contains four important elements. The introductory language sets forth the fundamental principle of proportionate distribution of property tax revenues to former tax increment of the redevelopment agencies. The introduction states: "For all distributions of property tax revenues and other moneys pursuant to this part, the distribution to each taxing entity shall be in an amount proportionate to its share of property tax revenues in the tax rate area in that fiscal year, as follows: . . ." (§ 34188.) As pointed out above, the trial court and the parties agree that "an amount proportionate to its share of property tax revenues" means the taxing entity's Assembly Bill 8 pro rata share. Thus, according to the plain meaning of the introduction, the Legislature intended to apply the historically accepted pro rata distribution of property taxes to the amount local agencies would receive during the wind down of the redevelopment agencies.

The second element of section 34188 is consistent with distribution of the trust fund according to Assembly Bill 8 pro rata shares and the broader notion that the Legislature intended to equalize the distributions to taxing entities who had favorable passthrough agreements with those that did not. Subdivision (a)(1) states: "For distributions from the Redevelopment Property Tax Trust Fund, the share of each taxing entity shall be applied to the amount of property tax available in the Redevelopment

19

Property Tax Trust Fund after deducting the amount of any distributions under paragraphs (2) and (3) of subdivision (a) of Section 34183." (§ 34188, subd. (a)(1).) Paragraph (2) includes enforceable obligations and paragraph (3) includes administrative costs. Thus, the plain language compels the auditor-controller to deduct enforceable obligations and administrative costs from the trust fund before computing each tax entity's proportionate share. But share of what? Subdivision (a)(1) prescribes that the calculation includes both the passthrough payments and the residual moneys because, as the trial court explained, "The exclusion of subsections (2) and (3) from the calculation indicates that the amounts not listed -- the passthrough amounts and the actual residual -- are to be *included* in the entitlement calculation."

This language appears, however, to be at odds with section 34183. Because passthrough payments are given preferred status and are paid first, pursuant to section 34183, subdivision (a)(1), they no longer remain in the pool of money to be distributed. According to Auditor, the passthrough payments have been remitted and are no longer "available" in the trust fund, as that term is used in subdivision (a)(1). Yet section 34188, subdivision (a)(1) directs the auditor-controller to include the passthrough payments in the moneys in the trust fund subject to distribution. This conflict presents the first problem deciphering the plain meaning of the statutes.

The third and fourth elements of the initial version of section 34188 support the same theme—a legislative scheme to cap the amount of distributions a taxing entity can receive from the trust fund at its Assembly Bill 8 pro rata share. The first sentence of subdivision (a)(2) states: "For each taxing entity that receives passthrough payments, that agency shall receive the amount of any passthrough payments identified under paragraph (1) of subdivision (a) of Section 34183, in an amount not to exceed the amount that it would receive pursuant to this section in the absence of the passthrough agreement." (§ 34188, subd. (a)(2).) Taken alone, the meaning of this sentence is straightforward. Taxing entities with passthrough agreements in excess of their

20

Assembly Bill 8 pro rata share would forfeit the amount of the excess. In short, the amount of the passthrough when added to the Assembly Bill 8 share of the residual monies in the fund cannot exceed the taxing entities' Assembly Bill 8 pro rata share.

If, however, the passthrough payment is less than the taxing entity's Assembly Bill 8 share, section 34188, subdivision (a)(2) directed the auditor-controller to supplement the passthrough payment with an amount from the residual to render the total amount of the distribution equal to the entity's Assembly Bill 8 share. The second sentence of subdivision (a)(2) reads: "However, to the extent that the passthrough payments received by the taxing entity are less than the amount that the taxing entity would receive pursuant to this section in the absence of a passthrough agreement, the taxing entity shall receive an additional payment that is equivalent to the difference between those amounts." (§ 34188, subd. (a)(2).)

As a result of section 34188, some auditor-controllers gave what came to be known as "haircuts" to the passthrough payments. Since section 34188 appeared to cap the combined amount a taxing entity could receive in passthrough payments and as a residual distribution to its Assembly Bill 8 pro rata share, then in some cases the passthrough payments would have to be trimmed so as not to exceed the cap. The Legislature abolished the haircuts, but in doing so created the more perplexing problem we now face.

In Assembly Bill 1484, as recited above, the Legislature clarified its intent regarding passthrough payments. In essence, the Legislature affirmed that those payments are sacrosanct. Consistent with the priority of payments established in section 34183, passthrough payments are to be paid first and paid in full. After Assembly Bill 1484 was enacted, there would be no further trips to the barber shop. The Legislature failed, however, to rewrite section 34188 leaving the extant provisions hopelessly ambiguous, inconsistent, and unworkable.

21

It is clear that Assembly Bill 1484 amends part of section 34188; what is not clear is just how much it amends. Eliminating passthrough haircuts is blatantly inconsistent with the first sentence of subdivision (a)(2) which had limited the passthrough payments to "an amount not to exceed the amount that it would receive pursuant to this section in the absence of the passthrough agreement." (§ 34188, subd. (a)(2).) As a result, there is no doubt Assembly Bill 1484 amends this sentence by eliminating the possibility of a haircut.

But the thornier question for us to determine is what remains of section 34188 after the Assembly Bill 1484 amendment. Does honoring passthrough payments in the manner dictated by Assembly Bill 1484 amend subdivision (a)(1) as well? In other words, since passthrough payments are accorded first priority in section 34183 and Assembly Bill 1484, does that mean they too should be deducted along with enforceable obligations and administrative costs from the trust fund pool before applying each tax entity's Assembly Bill 8 pro rata share? Or, as Cities contend, does Assembly Bill 1484 merely confirm that all passthrough payments should be paid in full but the remainder of section 34188 remains intact? In Cities' view, the fact they are given priority does not change the statute's aim to equalize total payments to Assembly Bill 8 pro rata shares. Cities acknowledge that the amendment creates an exception, but Cities do not find the exception problematic. We do. According to Cities, the exception applies only when a taxing entity's passthrough payment exceeds the amount of its Assembly Bill 8 pro rata share, and then the entity would be ineligible to receive any additional distributions from the trust fund. That exception, however, is irreconcilably in conflict with proportionate distribution of trust funds according to Assembly Bill 8 shares. Once some of the taxing entities with favorable passthrough agreements are paid in excess of their Assembly Bill 8 shares, others will have to receive less. The amount in the fund does not grow; rather the shares of the fixed amount must be reduced.

The problem is thus simply stated:  The plain meaning of Assembly Bill 1484 directing auditor-controllers to pay passthrough payments in full conflicts with the plain meaning of section 34188 to cap passthrough payments to Assembly Bill 8 pro rata shares.  Or to use the more colloquial characterization of the problem, Assembly Bill 1484's elimination of passthrough haircuts renders a proportionate distribution of the trust funds impossible.  Given the inherent conflict between section 34188's direction to apply Assembly Bill 8 pro rata shares and Assembly Bill 1484's direction to pay all passthrough payments in full as well as the inherent conflict between section 34183, subdivision (a)(4)'s definition of the residual pool of money to be distributed and section 34188's definition of the residual pool, what methodology must auditor-controllers follow in distributing the residual fund?

## II

### *The Solution*

Confronted with three laws, that when construed together and in light of their statutory purpose, conflict, we turn for a solution to well worn rules of statutory construction.  " ' "When we interpret the meaning of statutes, our fundamental task is to ascertain the aim and goal of the lawmakers so as to effectuate the purpose of the statute" ' " and " ' "if the clear meaning of the statutory language is not evident after attempting to ascertain its ordinary meaning or its meaning as derived from legislative intent, we will 'apply reason, practicality, and common sense to the language at hand.  If possible, the words should be interpreted to make them workable and reasonable [citations], . . . practical [citations], in accord with common sense and justice, and to avoid an absurd result [citations].' [Citation.]" [Citation.]' " (*Sacks v. City of Oakland* (2010) 190 Cal.App.4th 1070, 1082.)  "In cases of uncertain meaning, we may also consider the consequences of a particular interpretation, including its impact on public policy." (*Wells v. One2One Learning Foundation* (2006) 39 Cal.4th 1164, 1190.)

If, after an examination of the statutes in context, they "conflict on a central element, we strive to harmonize them so as to give effect to each. If conflicting statutes cannot be reconciled, later enactments supersede earlier ones [citation], and more specific provisions take precedence over more general ones [citation]." (*Collection Bureau of San Jose v. Rumsey* (2000) 24 Cal.4th 301, 310.) " ' " [A]ll presumptions are against a repeal by implication. [Citations.]' [Citation.] Absent an express declaration of legislative intent, we will find an implied repeal 'only when there is no rational basis for harmonizing the two potentially conflicting statutes [citation], and the statutes are "irreconcilable, clearly repugnant, and so inconsistent that the two cannot have concurrent operation." ' [Citation.]" ' [Citations.]" (*Pacific Palisades Bowl Mobile Estates, LLC v. City of Los Angeles* (2012) 55 Cal.4th 783, 805.) " 'Because the "doctrine of implied repeal provides that the most recently enacted statute expresses the will of the Legislature" [citation], application of the doctrine is appropriate in those limited situations where it is necessary to effectuate the intent of drafters of the newly enacted statute.' " (*Schatz v. Allen Matkins Leck Gamble & Mallory LLP* (2009) 45 Cal.4th 557, 573.)

Try as we might, we cannot ascertain any plain meaning to section 34188, in light of Assembly Bill 1484 and section 34183, that would allow us to harmonize the three provisions. We therefore must apply "reason, practicality, and common sense to the language at hand" with an aim toward making them "workable and reasonable." Both parties try to surmise legislative intent by construing the statutes together and both urge us to read the statutes in light of the broader objectives the Legislature sought to achieve in the dismantling of redevelopment agencies throughout the state. Auditor contends that Assembly Bill 1484, the later enacted law, reflects a legislative intent to give primacy to passthrough payments and, only after they are paid, to apply the Assembly Bill 8 pro rata shares to the residual. Cities insist that the primary objective sought to be achieved is,

24

above all else, a proportionate distribution of all trust fund moneys. Both argue their version of the spirit of the law should prevail and allow us to harmonize the statutes.

"We must follow the language used by the Legislature 'whatever may be thought of the wisdom, expediency, or policy of the act' [citation] and we emphasize '[o]ur preference for literalism is compelled by the constitutional doctrine of separation of powers.' [Citation.] ' "It is an elementary proposition that courts only determine by construction the scope and intent of the law when the law itself is ambiguous or doubtful. . . . To allow a court . . . to say that the law must mean something different from . . . its language, because the court may think that its penalties are unwise or harsh would make the judicial superior to the legislative branch of the government, and practically invest it with lawmaking power. The remedy . . . is not in interpretation but in amendment or repeal." [Citation.]' [Citation.]" (*Willis v. State of California* (1994) 22 Cal.App.4th 287, 293.)

Here the parties can both point to language in the statutes consistent with the spirit and purpose they advocate. The challenge is not for us to divine an overarching purpose, for surely a statutory scheme as complex as the winding down of 400 redevelopment agencies can achieve multiple objectives, but to determine whether the conflicting provisions can be harmonized, or whether the Legislature impliedly repealed those provisions in section 34188 that conflict with Assembly Bill 1484 because " 'the two acts are so inconsistent that there is no possibility of concurrent operation.' " (*Professional Engineers in California Government v. Kempton* (2007) 40 Cal.4th 1016, 1038.) "Because 'the doctrine of implied repeal provides that the most recently enacted statute expresses the will of the Legislature' [citation], application of the doctrine is appropriate in those limited situations where it is necessary to effectuate the intent of drafters of the newly enacted statute." (*Ibid.*)

Simply put, this is one of the rare cases in which a court cannot divine harmony where there is none. The California Supreme Court, facing another irreconcilable

conflict between two statutes, admonishes us as follows: "[T]he requirement that courts harmonize potentially inconsistent statutes when possible is not a license to redraft the statutes to strike a compromise that the Legislature did not reach. (See *Garcia v. McCutchen* (1997) 16 Cal.4th 469, 479 ['the general policy underlying legislation "cannot supplant the intent of the Legislature as expressed in a particular statute" '].) The cases in which we have harmonized potentially conflicting statutes involve choosing one plausible construction of a statute over another in order to avoid a conflict with a second statute. [Citations.] This canon of construction, like all such canons, does not authorize courts to rewrite statutes." (*State Dept. of Public Health v. Superior Court* (2015) 60 Cal.4th 940, 956.)

In articulating the problem with the language of the statutes, we pointed out the inconsistencies between sections 34183, 34188, and Assembly Bill 1484. Indeed, Assembly Bill 1484 acknowledges the inconsistency and uncertainty generated by sections 34183 and 34188. The Legislature sought to clarify its intent. "It was the intent of the Legislature in enacting that measure that the amount of the passthrough payments that are addressed by that section be determined in the manner specified by paragraph (1) of subdivision (a) of Section 34183 of the Health and Safety Code, and that the amount so calculated not be reduced or adjusted pursuant to the operation of any other provision of that measure." (Stats. 2012, ch. 26, § 36.) As explained above, this intent conflicts with section 34188's haircut provisions. The two provisions cannot be harmonized and Assembly Bill 1484, the later statute, must prevail.

The trial court recognized that Assembly Bill 1484 directs auditor-controllers to pay all passthrough agreements in full, whether or not they exceeded their proportionate Assembly Bill 8 pro rata share. But the court adopted Cities' view that Assembly Bill 1484 did not affect the calculation of the total amount of moneys to be distributed. That is to say, pursuant to section 34188, subdivision (a), the total amount of the passthrough payments must be added to the amount of the residual pot of money as described in

26

section 34183 and then the Assembly Bill 8 shares must be applied. Since there may be passthrough payments that exceed the taxing entity's Assembly Bill 8 pro rata share, however, other entities' distributions must be reduced when applying the trial court's methodology. Yet distributions that distort proportionate distribution according to Assembly Bill 8 shares is antithetical to the very purpose of section 34188. The two statutes seek to achieve conflicting purposes. In such a case, section 34188 must yield to the later enacted Assembly Bill 1484.

There is yet another reason to construe the statutes as Auditor suggests. As mentioned above, amicus curiae asserts that Cities' methodology, as accepted by the trial court, violates Propositions 1A and 22. We decline to determine the merits of amicus curiae's constitutional challenge because the issues were not raised by the parties or addressed by the trial court. Nevertheless, we note, "If a statute is susceptible of two constructions, one of which renders it constitutional and the other unconstitutional (or raises serious and doubtful constitutional questions), the court will adopt the construction which will render it free from doubt as to its constitutionality, even if the other construction is equally reasonable." (*Jonathan L. v. Superior Court* (2008) 165 Cal.App.4th 1074, 1101.) Here we conclude Cities' methodology raises "serious and doubtful constitutional questions" involving Propositions 1A and 22, and therefore, we must construe the statutory scheme in a manner "which will render it free from doubt as to its constitutionality." (*Jonathan L.*, at p. 1101.)

Proposition 1A forbids the Legislature from changing "the pro rata shares in which ad valorem property tax revenues are allocated among local agencies" (Cal. Const., art. XIII, § 25.5, subd. (a)(3)) unless passed by two-thirds of the membership. No one maintains the statutes garnered the requisite two-thirds vote. Proposition 22 further limits the Legislature in allocating property tax revenue. According to Proposition 22, the Legislature no longer may "relocate, transfer, borrow, appropriate, [or] restrict the use of" local taxes. (Cal. Const., art. XIII, § 24, subd. (b).) Amicus curiae raises the plausible

27

argument that in redistributing the Assembly Bill 8 shares to accommodate the satisfaction of passthrough payments, Cities' construction of the statute violates Proposition 22. Thus, without deciding on the constitutionality of Cities' interpretation of the statutes, we can say their interpretation raises substantial doubt as to the constitutionality of Cities' methodology, adding support to our conclusion the trial court erred and Auditor's methodology must prevail.

## DISPOSITION

The judgment is reversed and the case is remanded to the trial court with instructions to vacate its order granting Cities' petition for writ of mandate and to enter an order denying Cities' writ petition consistent with this opinion. Appellants shall recover their costs on appeal. (Cal. Rules of Court, rule 8.278(a)(1) & (2).)


 /s/ 
RAYE, P. J.



We concur:



 /s/ 
BLEASE, J.



 /s/ 
BUTZ, J.