Filed 1/24/22

<u>CERTIFIED</u> <u>FOR</u> <u>PUBLICATION</u>

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| NORTH SONOMA COAST FIRE PROTECTION DISTRICT, | C090758 |
| Plaintiff and Appellant, | (Super. Ct. No. 34-2017-80002896-CU-WM-GDS ) |
| v. | |
| ERICK ROESER, as Auditor-Controller, etc., et al., | |
| Defendants and Respondents; | |
| DEPARTMENT OF FINANCE, | |
| Real Party in Interest and Respondent. | |

APPEAL from a judgment of the Superior Court of Sacramento County, Laurie M. Earl, Judge. Affirmed.

William D. Ross, Kypros G. Hostetter and David P. Schwarz for Plaintiff and Appellant.

Holley O. Whatley, Pamela K. Graham and Jeremy M. Fonseca for Defendants and Respondents

Rob Bonta, Attorney General, Thomas S. Patterson, Senior Assistant Attorney General, Anthony R. Hakl, Supervising Deputy Attorney General, Gabrielle D. Boutin and Seth E. Goldstein, Deputy Attorneys General, for Real Party in Interest and Respondent.

In 1992 and 1993, California was in the midst of a budget crisis that left it struggling to adequately fund public schools and community colleges. To help address the issue, in 1992, the Legislature created an Education Revenue Augmentation Fund (or an ERAF) in each county and then shifted billions of dollars in property tax revenues from counties, cities, and special districts to these funds. In 1993, with the state still struggling to fund education programs, the Legislature shifted billions more in property tax revenues from counties, cities, and special districts to the ERAFs. In both these enactments, the Legislature also ensured that a portion of property tax revenues would continue to be directed toward the ERAFs in future years. Through these changes, the Legislature permanently changed how public schools and community colleges are funded in California. It also permanently reduced the amount of property tax revenues that counties, cities, and special districts receive on an annual basis.

In this case, a special district called North Sonoma Coast Fire Protection District (the District) alleges that Sonoma County (the County) and the County Auditor-Controller (the County Auditor) misapplied the statutes that created the ERAFs and consequently caused the District to receive less property tax revenues than it should have received. The trial court, however, found none of the District's arguments in favor of its position persuasive and rejected its claim. Because we too find none of the District's arguments persuasive, we affirm the trial court's decision.

BACKGROUND

I

*Legal Background*

The legal context for the District's claims is long and complicated. It starts, like many tax cases, with the enactment of Proposition 13 in 1978.

A. *Proposition 13*

For much of California's history, local governments could levy their own property taxes to help finance their activities. (*California Redevelopment Assn. v. Matosantos*

2

(2011) 53 Cal.4th 231, 243 (*Matosantos*).) But in 1978, California voters decided that they levied too much and adopted Proposition 13. Proposition 13 amended the state constitution to cap real property taxes at one percent of a property's "full cash value" and to limit annual assessment increases to two percent a year. (Cal. Const., art. XIII A, §§ 1, subd. (a), 2, subds. (a)-(b).) It also limited who could collect these taxes. (Cal. Const., art. XIII A, § 1, subd. (a).) "In place of multiple property taxes imposed by multiple political subdivisions, it substituted a single tax to be collected by counties and thereafter apportioned." (*Matosantos, supra*, 53 Cal.4th at p. 244.) Proposition 13 declined, however, to specify how collected taxes should be apportioned, "leaving the method of allocation to state law." (*Ibid.*)

Through these changes, Proposition 13 saved property owners billions of dollars in property taxes in its first year alone. (*Nordlinger v. Hahn* (1992) 505 U.S. 1, 5 [120 L.Ed 2d 1, 5].) But it also threatened to devastate the financing for many local governments that relied on property tax revenues. To support these local governments in the wake of Proposition 13, the Legislature promptly moved to provide state funding to local governments to replace their lost revenues. (*City of Scotts Valley v. County of Santa Cruz* (2011) 201 Cal.App.4th 1, 8 (*Scotts Valley*).)

First, as a temporary measure in 1978, the Legislature "provided [billions] of dollars in state assistance or 'bailout' payments to local governments to insure they would maintain their fiscal positions at a minimum level of 90 percent of their pre-Proposition 13 budgets." (*American River Fire Protection Dist. v. Board of Supervisors* (1989) 211 Cal.App.3d 1076, 1079 (*American River Fire Protection Dist.*) [discussing Senate Bill No. 154]; see also *Jarvis v. Cory* (1980) 28 Cal.3d 562, 574 ["Senate Bill 154 (the so-called 'bailout bill') . . . earmarked $5 billion in state funds for local use"].)

Later, as a long-term solution in 1979, the Legislature made this "bailout" permanent " 'by means of the permanent shift of the school property tax base to local agencies and state "buyout" of certain county health and welfare program costs.'

3

[Citation.]" (*Scotts Valley, supra*, 201 Cal.App.4th at p. 8.) The Legislature also, at this same time, established a general method of allocating property tax revenues to local governments. (*City of Alhambra v. County of Los Angeles* (2012) 55 Cal.4th 707, 713 (*Alhambra*).) The 1979 bailout and allocation method, which we will turn to more later, are commonly referred to as the A.B. 8 bailout and A.B. 8 allocation system after the applicable Assembly bill. (*Ibid.* [referring to "the 'A.B. 8' allocation system"]; *Scotts Valley*, at p. 8 [referring to "the 'A.B. 8' allocation system"]; *id.* at p. 16 [referring to " 'the A.B. 8 "bailout" legislation' "].)

In the end, "Proposition 13 transformed the government financing landscape in at least three ways relevant to this case. First, by capping local property tax revenue, it greatly enhanced the responsibility the state would bear in funding government services, especially education. [Citations.] Second, by failing to specify a method of allocation, Proposition 13 largely transferred control over local government finances from the state's many political subdivisions to the state, converting the property tax from a nominally local tax to a de facto state-administered tax subject to a complex system of intergovernmental grants. [Citations.] Third, by imposing a unified, shared property tax, Proposition 13 created a zero-sum game in which political subdivisions (cities, counties, special districts, and school districts) would have to compete against each other for their slices of a greatly shrunken pie." (*Matosantos, supra*, 53 Cal.4th at pp. 244-245, fn. omitted; see also Rev. & Tax. Code, § 95, subd. (m) [defining "special district"].)[1]

B. *ERAFs I and II*

In later years, the Legislature continued to modify local government financing as a result of Proposition 13, particularly in the area of education. Relevant here, in 1992, while in the midst of a state budget crisis that left the state struggling to adequately fund

---

[1] Undesignated statutory references are to the Revenue and Taxation Code.

public schools and community colleges, "the Legislature enacted legislation creating ERAF's in each county and shifted billions of dollars in property tax revenues from cities, counties, and [special districts] into them." (*Alhambra, supra*, 55 Cal.4th at pp. 713-714.) In 1993, while the budget crisis continued, the Legislature enacted further legislation that shifted billions more in property tax revenues from cities, counties, and special districts to the ERAFs. (*Id.* at p. 714; see also § 97.3, subds. (a)(1), (b)(1), (c)(1).)

The Legislature accomplished these shifts through two adjustments in the allocation of property tax revenues to local governments. Under the A.B. 8 allocation system, the process for allocating these revenues is generally as follows: "[I]n every current fiscal year, each local entity receives property tax revenues equal to what it received in the prior year (also referred to as its base) (§ 96.1, subd. (a)(1)), plus its proportional share of any increase in revenues due to growth in assessed value within its boundaries, which is defined as the ' "annual tax increment" ' (§ 96.1, subd. (a)(2); see §§ 96.2, 96.5). The sum of these two amounts—the prior year base plus the current year's proportional share of the tax increment—becomes each jurisdiction's new base amount for the following year's calculations. (§§ 96.1, subd. (a)(1), 96.5.)" (*Alhambra, supra*, 55 Cal.4th at p. 713.)

The 1992 legislation, commonly called ERAF I, modified this process for the 1992-1993 fiscal year. Under this legislation, each local entity's "base" for the 1992-1993 fiscal year (i.e., the amount of property tax revenues it received for the 1991-1992 fiscal year) was "deemed" to be a lower amount. (§§ 97, subd. (a)(1) [cities and counties], 97.2, subds. (a)(1) [counties], (b)(1) [cities], (c)(1) [special districts]; see also § 97.2, subd. (e) [discussing further shifts in later years for cities and counties].) For each city, for example, ERAF I generally reduced the city's base for the 1992-1993 fiscal year by nine percent. (§ 97.2, subd. (b)(1).) So if, absent ERAF I, a city would have had a base of $100,000 for the 1992-1993 fiscal year (based on its receiving $100,000 in property tax revenues for the 1991-1992 fiscal year), it would now be "deemed" to have a

5

base of $91,000 for the 1992-1993 fiscal year.  Counties and special districts faced different reductions under ERAF I.  Relevant here, for each special district, ERAF I generally reduced the district's base for the 1992-1993 fiscal year by 35 percent, though it required a lesser or greater reduction under certain circumstances.  (§ 97.2, subd. (c)(1)-(5).)  Under ERAF I, the county's ERAF would receive all the revenues that the county, cities, and special districts would have received in the absence of the legislation.  (§§ 97, subd. (a)(2), 97.2, subds. (d), (e)(2).)  The county auditor would then distribute the ERAF's funds to school districts, county offices of education, and community college districts.  (§ 97.2, subd. (d)(1).)

The 1993 legislation, commonly called ERAF II, operated in a similar fashion. Under ERAF II, each local entity's base for the 1993-1994 fiscal year was "deemed" to be a lower amount.  (§§ 97.1, subd. (a) [cities and counties], 97.3, subds. (a) [counties], (b) [cities], (c) [special districts].)  To calculate this amount for special districts, each county auditor applied a formula specified in the statute that was intended to capture "the current amount of special districts' property tax revenues attributable to [their receipt of state assistance] under AB 8."  (Sen. Budget & Fiscal Revenue Com., analysis of Sen. Bill No. 1135 (1993-1994 Reg. Sess.) p. 5; see § 97.3, subd. (c)(3)(A) [the amount of the reduction for each special district equals, with some "adjust[ments]," "the amount of its [A.B. 8] allocation . . . for the 1993-94 fiscal year multiplied by the ratio determined pursuant to paragraph (1) of subdivision (a) of former Section 98.6, as that section read on June 15, 1993"]; Stats. 1992, ch. 699, § 14 [showing the text of former section 98.6, which describes a ratio that equaled "the amount of state assistance payment for the special district for the 1978-79 fiscal year divided by the sum of the state assistance payment for the special district plus the amount of property tax revenue allocated to the special district for the 1978-79 fiscal year . . ."].)  Counties and cities, facing different formulas, also had their property tax revenues reduced.  (§§ 97.1, subd. (a) [counties and cities], 97.3, subds. (a) [counties], (b) [cities].)  Under ERAF II, as with ERAF I, the

6

county's ERAF would receive all the revenues that the county, cities, and special districts would have received in the absence of the new law. (§§ 97.1, subd. (a)(2), 97.3, subd. (d).)

Through these statutes, the Legislature "permanently modified the A.B. 8 allocation system." (*Alhambra, supra*, 55 Cal.4th at p. 714.) To demonstrate the effect of the ERAF statutes, recall that, under our city example, the city would receive $91,000 plus the 1992-1993 tax increment (rather than $100,000 plus this increment) for the 1992-1993 fiscal year as a result of ERAF I. Consider now the effect of that reduction on future years (and for the sake of simplicity, ignore the impact of ERAF II). For the next year, the city would receive $91,000 plus the 1992-1993 and 1993-1994 tax increments (rather than $100,000 plus these increments); for the year after that, the city would receive $91,000 plus the 1992-1993, 1993-1994, and 1994-1995 tax increments (rather than $100,000 plus these increments); and so on. The county's ERAF, on the other hand, would "effectively becom[e] another entity receiving its share of local property tax revenues through the annual A.B. 8 allocation system." (*Alhambra,* at p. 714; but see *id.* at p. 714, fn. 6.) To continue with our example, for the 1992-1993 fiscal year, the ERAF would receive $9,000 (plus whatever other money it received from other local agencies) plus the 1992-1993 tax increment; the next year, it would receive its 1992-1993 allotment plus the 1993-1994 tax increment; and so on. (See §§ 97.2, subd. (d)(5) [incorporating each county's ERAF into the county's yearly allocation of property taxes under section 96.1], 97.3, subd. (d)(5) [same]; see also Sen. Rules Com., Off. of Sen. Floor Analyses, 3d reading analysis of Assem. Bill. No. 3027, as amended Aug. 10, 1992, p. 3 [explaining that proposed § 97.03, subd. (d)(4) (now § 97.2, subd. (d)(5)) would give the ERAFs "a permanent part of the property tax revenue base"]).)

### C. ERAF Accounting Methods

To determine an ERAF's share of revenues under the ERAF statutes, county auditors must use one of two accounting methods. Under the first method, county

auditors allocate property tax revenues to their ERAF on a "tax rate area" basis—which is the general method for allocating property tax revenues to local agencies. (See, e.g., §§ 96, subd. (a), 96.1, subd. (a)(1), 97.4, subd. (a).) Under this method, each county first assigns every parcel in the county "to a certain tax rate area." (*City of Dinuba v. County of Tulare* (2007) 41 Cal.4th 859, 866.) The county then, after collecting "[p]roperty tax revenue from parcels assigned to a certain tax rate area," allocates the revenue "to the local agencies having jurisdiction in the tax rate area." (*Ibid.*) In particular, "[f]or each tax rate area," the county auditor allocates to "each jurisdiction [covering that tax rate area] . . . an amount of property tax revenue equal to" its base for that tax rate area (i.e., the amount it received in the prior fiscal year in that area) plus its annual tax increment for that tax rate area (i.e., its proportional share of any increase in revenues due to growth in assessed value in that area). (§§ 96.1, subd. (a)(1)-(2), 96.2, 96.5; see *Alhambra, supra*, 55 Cal.4th at p. 713.) An entity's total allocation is then the sum of these "tax rate area" allocations. So, for example, if an entity covered three tax rate areas, its total allocation would be the sum of its allocations for these three areas.

Under the second method, county auditors instead allocate property tax revenues to their ERAF on a "countywide" basis—though an auditor may follow this approach only if he or she "ensure[s] adequate recognition of year-to-year revenue growth so that the results of changes implemented on a countywide basis do not differ materially from the results which would be obtained from the use of a tax rate area basis." (§ 97.4, subd. (a).) The Revenue and Taxation Code does not expressly instruct county auditors on how to allocate property tax revenues on a "countywide" basis. But according to the County, the County Auditor, and County Service Area No. 40 (collectively, the County Respondents) and the District, the "countywide" approach for allocating revenues is not truly a countywide method. A county auditor, for example, cannot simply allocate to the ERAF a single countywide base (i.e., the amount the ERAF received in the prior fiscal year in the entire county) plus a single countywide tax increment (i.e., the ERAF's

8

proportional share of any increase in revenues due to growth in assessed value in the county as a whole).  An auditor instead, the County Respondents and the District conclude, must follow a more complicated approach that accounts for how the ERAF statutes operate in practice.  Under their understanding of the "countywide" method, which they typically call the "jurisdictional" method, a county auditor first calculates the county's, each city's, and each special district's entitlement to property tax revenues using the "tax rate area" method as if the ERAF statutes were never adopted, and he or she then shifts a portion of each of these jurisdiction's property tax revenues to the ERAF.

The County Respondents and the District generally summarize these two allocation methods as follows:  Under the "tax rate area" method, the county auditor calculates the ERAF's percentage share of revenue from each tax rate area in the county, with the ERAF's total allocation equaling the sum of its allocations from all tax rate areas in the county.  And under the "countywide" method, in contrast, the auditor calculates the ERAF's percentage share of revenue from each local agency in the county, with the ERAF's total allocation equaling the sum of its allocations from all local agencies in the county—that is, the sum of its allocations from the county, each city, and each special district.  In the parties' view, then, the "tax rate area" method is an area-based approach for allocating revenues and the "countywide" method is an entity-based approach for allocating revenues.  For purposes here, we accept the County Respondents' and the District's interpretation.[2]

_____

[2]  The Department of Finance, one of the real parties in interest in this case, has declined to express an opinion on the proper application of the "countywide" method.

9

II

*Factual Background*

A.  *CSA 6, CSA 40, and the District*

In 1973, the County formed County Service Area No. 6 (CSA 6) to provide fire protection and sewer services in a part of the County known as The Sea Ranch.  The County funded CSA 6, which in turn supported a nonprofit fire department called The Sea Ranch Volunteer Fire Department Inc. (Sea Ranch Fire), through property taxes imposed on parcels within CSA 6's boundaries.  Under the A.B. 8 allocation system, the County initially distributed to CSA 6 about 19 percent of all property tax revenues collected in CSA 6's jurisdiction.  But following the enactments of ERAFs I and II, the County reduced CSA 6's share to about 10 percent of all property tax revenues, a reduction of about 47 percent.  Because CSA 6's lost revenues would be shifted to the County's ERAF, the County has described CSA 6 as having an "ERAF shift" of about 47 percent.  (See §§ 97.2, subd. (d)(1); 97.3, subd. (d)(1).)

In 1993, around the time of ERAF II's passage, the County formed County Service Area No. 40 (CSA 40) to replace several smaller CSAs, including CSA 6.  Under the terms of the reorganization, CSA 40 inherited all the property tax revenues that the CSAs that joined it had previously received for fire protection services.  It also, the County Auditor concluded, inherited the ERAF shifts of these CSAs.  According to the County Auditor, "[i]n counties that implemented ERAF under the jurisdictional method—like Sonoma County here—the [county auditor] (and potentially the parties to the jurisdictional change) must determine how properly and best to apply the original shifts of the affected jurisdictions to the resulting jurisdictions."  Applying that approach in the case of CSA 40, the County Auditor determined "[t]he ERAF shift of CSA 40 . . . by aggregating the dollar amounts that each entering jurisdiction shifted to [the] ERAF in the prior year and applying the aggregated current year growth factors of each entering jurisdiction."  The County Auditor, after aggregating these amounts, found that

10

CSA 40 had an ERAF shift of about 15 percent—which meant that about 15 percent of CSA 40's A.B. 8 allocation of property tax revenues would be shifted to the ERAF.

In 2016, over two decades after CSA 40's formation, the County Local Agency Formation Commission granted Sea Ranch Fire's request to detach certain areas (including Sea Ranch) from CSA 40 and to form the District to serve these areas. Sea Ranch Fire requested the change, in part, because it sought greater local control over fire protection services and over the use of local tax dollars. As part of the reorganization, Sea Ranch Fire and the County negotiated an agreement on the allocation of property tax revenues (the Tax Agreement). Relevant here, the agreement states: "[T]he property tax revenues of the Subject Territory currently allocated to CSA-40 shall be transferred to the District, subject to," among other things, the requirement that the County Auditor "make any adjustments to the allocations of property tax revenue to the District required by all applicable state law, which may cause the amount [of] the property tax revenue to be allocated to the District to be different from that previously allocated to CSA-40. These adjustments include[] . . . applicable Education Revenue Augmentation Fund calculations or allocations. . . ."

B. *The County's Allocation of Revenues and the District's Suit*

For fiscal year 2017-2018, the first year after the District's formation, the County Auditor concluded that the District should have an ERAF shift of 45.85 percent. In reaching this figure, the County Auditor largely relied on section 97.4, which the auditor construed to state "that the use of the countywide/jurisdictional method of ERAF implementation must not produce results materially different from those that would have been produced under the [tax rate area] method."

In the County Auditor's understanding, calculating the District's ERAF shift on a "countywide" basis would result in the District having an ERAF shift of 15 percent— which takes after the ERAF shift of 15 percent for CSA 40. But, the auditor concluded, had the County used the "tax rate area" method rather than the "countywide" method at

11

ERAF implementation in 1992, then the District would instead have had a total ERAF shift of 45.85 percent—which is an aggregation of the ERAF shifts of the districts (including CSA 6) that initially served the District's area before CSA 40. The County Auditor reasoned that these two approaches resulted in different results because, under the "tax rate area" approach, the ERAF receives a percentage of the revenues from each tax rate area in the county, with the percentage for each area remaining the same even if the local agencies in that area change; but under the "countywide" approach, the ERAF receives a percentage of the revenues from each local agency in the county, with the percentage for each agency potentially changing (and in this case, actually changing) when the agencies themselves change.

Because of the large difference between 15 percent and 45.85 percent, and because section 97.4 reflects an intent that "changes implemented on a countywide basis . . . not differ materially from the results which would be obtained from the use of a tax rate area basis," the County Auditor chose to use the 45.85 percent figure for the District's ERAF shift. The auditor also found that equitable considerations supported this decision. The auditor explained that CSA 40's ERAF shift was initially calculated to be 15 percent, rather than a lower figure, because CSA 6 contributed a particularly high ERAF shift of about 47 percent. Now that the CSA 6 area had detached from CSA 40 and joined the District, the auditor found it would be "inequit[able]" to "leav[e] the rest of CSA 40 with the higher shift it received solely because of CSA 6's original membership."

To demonstrate the County Auditor's concerns in a simple example, suppose that a district (district 1) receives $100 in property tax revenues and contributes $50 to the ERAF (a shift of 50 percent) and that two other districts (districts 2 and 3) each receive $100 in property tax revenues and contribute $5 to the ERAF (a shift of 5 percent). Suppose further that these three districts later combine to form district 4. Under the County Auditor's "countywide" approach, district 4 would receive $300 in revenues and contribute $60 to the ERAF (a shift of 20 percent). But now suppose that district 1

12

detaches from district 4. Should both districts 1 and 4 now have an ERAF shift of 20 percent? Or should district 1 have an ERAF shift of 50 percent, as it initially had, and district 4 have an ERAF shift of 5 percent, as districts 2 and 3 initially had? Under these types of facts, the County Auditor found the latter approach would be most equitable and most consistent with section 97.4's requirements.

The District, however, felt differently. Believing an ERAF shift of 45.85 percent was too high, it asked the County Auditor to recalculate the ERAF shift. But when that proved unsuccessful, it filed a petition for writ of mandate against the County and the County Auditor and named CSA 40 and the Department of Finance as real parties in interest.[3]

The District raised six principal claims in its suit, all of which we will cover in more detail in the discussion below. It alleged that (1) the County Auditor wrongly imposed an ERAF shift of over 45 percent because, under the ERAF statutes, a special district's ERAF shift cannot exceed 40 percent of the district's property tax revenue or 10 percent of the district's total revenue; (2) the auditor should have applied the formulas described in the ERAF statutes to determine the District's ERAF shift, rather than apply the ERAF shifts of the special districts that initially covered the District's territory; (3) even if the auditor could have applied the ERAF shift of a former district, that district should have been CSA 40, not CSA 6 or any other district; (4) even if the auditor could have applied the ERAF shift of CSA 6, the auditor might have miscalculated its ERAF shift; (5) the auditor should not have treated the District as a successor to CSA 6, because the District, unlike CSA 6, is an independent fire district; and (6) the auditor should not

---

[3] The District initially filed its suit in Sonoma County. But a few months later, after it added the Department of Finance to the case, all parties agreed to transfer the case to Sacramento County "because of the presence of California Department of Finance."

13

have treated the District as a successor to CSA 6, because CSA 6, unlike the District, provided both fire protection and wastewater services.

Following a hearing on the District's petition for writ of mandate, the trial court rejected all the District's claims. The District afterward appealed.

DISCUSSION

On appeal, the District raises the same claims it raised at the trial level, though in a rearranged order. First, it asserts that the County Auditor wrongly concluded that the District's ERAF shift should equal the combined ERAF shifts of the special districts that initially covered the District's territory. According to the District, rather than apply the ERAF shifts of these former districts, the auditor instead should have calculated the District's ERAF shift anew using the formulas described in the ERAF statutes. The District appears to reason that a county auditor has a "mandatory" duty to recalculate ERAF shifts whenever a new special district forms because section 97.2 of ERAF I and section 97.3 of ERAF II both use "the mandatory 'shall' before the requirement to make adjustments to the property tax allocations determined in Section 96.1."

But the District, in raising this argument, largely ignores the relevant text of sections 97.2 and 97.3. Both statutes, again, directed county auditors to reduce each special district's entitlement to property tax revenues based on a certain formula. And both statutes, it is true, use the term "shall." But the relevant obligations they created were not ongoing ones. Section 97.2, as relevant here, states: A county auditor's allocations of property tax revenues under section 96.1 "shall be modified for the 1992-93 fiscal year" using the formulas provided in the statute. (See also § 97.2, subd. (c) [providing the formula for special districts].) And section 97.3, similarly, states: A county auditor's allocations of property tax revenues under section 96.1 "shall be modified for the 1993-94 fiscal year" using the formulas provided in the statute. (See also § 97.3, subd. (c) [providing the formula for special districts].) Both statutes, then, required county auditors to calculate the applicable ERAF shift for each special district

14

decades ago—either in 1992 for the 1992-1993 fiscal year or in 1993 for the 1993-1994 fiscal year.  Considering the clear statutory text, we cannot say, as the District would have us, that county auditors must reapply the formulas described in sections 97.2 and 97.3 whenever a new special district forms.

Seeking a contrary finding, the District notes that the County itself once contemplated that the District's ERAF shift could be recalculated.  In support, it points to the parties' Tax Agreement, which, again, states:  "[T]he property tax revenues of the Subject Territory currently allocated to CSA40 shall be transferred to the District, subject to," among other things, the requirement that the County Auditor "make any adjustments to the allocations of property tax revenue to the District required by all applicable state law. . . .  These Adjustments include . . . applicable Education Revenue Augmentation Fund calculations or allocations. . . ."  But all this only shows that the County agreed to make adjustments "required by all applicable state law."  As the trial court explained, the Tax Agreement "neither mandates a recalculation of the ERAF nor precludes one; it simply directs the County to follow the law."

The District adds that a County official, around the time of the Tax Agreement, said in an email that the District would "not [be] prevented from attempting [to] achieve a different ERAF shift amount sometime in the future."  But this too is of no help to the District's position.  As the rest of the cited email shows, the County official was referencing the District's ability to "advocat[e] for ERAF shift reductions . . . at the state level."  The County official, in other words, was acknowledging the District's ability to attempt to change the law "at the state level," not accepting the District's view of the current state of the law.

Second, along the same lines, the District contends that the County Auditor should have calculated the District's ERAF II shift anew because, unlike CSA 6, it is an independent fire district.  For similar reasons, however, we reject this argument also.  ERAF II, it is true, treated dependent and independent fire districts differently.  (Compare

15

§ 97.3, subd. (c)(4)(A)(i) [limiting revenue reductions for all fire protection districts] with § 97.3, subd. (c)(4)(A)(ii) [further limiting revenue reductions for independent fire protection districts].)  But this distinction was only relevant at the time that ERAF II was first implemented.  Under section 97.3, again, county auditors needed to modify their allocations to special districts "for the 1993-1994 fiscal year."  So if, for example, a special district was a dependent fire district in the 1993-1994 fiscal year, but an independent fire district starting in 2000, that district could not object that the county auditor wrongly treated it as a dependent fire district "for the 1993-1994 fiscal year"—the year when ERAF II was implemented for special districts.  Nor could it assert that the county auditor now needs to recalculate the ERAF shift, as discussed above.  As the County Respondents note, "[b]ecause the ERAF shifts are historical figures, calculated in 1992-1993 for ERAF I and 1993-1994 for ERAF II, that the District may be an independent fire protection district now alters nothing."

Third, the District suggests that even if the County Auditor could have applied the ERAF shift of a prior district, that district should have been CSA 40, not CSA 6 or any other district.  The District basis its argument on a sentence in section 97.3 of the ERAF II that states:  "In the case of a special district that has been consolidated or reorganized, the auditor shall determine the amount of its current property tax allocation that is attributable to the prior district's or districts' receipt of state assistance payments [under A.B. 8]."  (§ 97.3, subd. (c)(3)(A).)  In the District's view, this language translates as follows:  In the case of a special district that has been consolidated or reorganized, the auditor shall apply the ERAF shift of the prior district.  Based on this reading, the District then suggests that because the prior district in this case is "undisput[ably]" CSA 40, its ERAF shift should match CSA 40's ERAF shift.

But the context of the District's cited sentence shows that it only describes certain actions that county auditors needed to take in 1993—not actions that each county auditor needs to take whenever a new district consolidates or reorganizes.  The opening line of

16

section 97.3 states: A county auditor's allocations of property tax revenues under section 96.1 "shall be modified *for the 1993-94 fiscal year* pursuant to subdivisions (a) to (c)." (Italics added.) Subdivision (c), the relevant subdivision here, deals with special districts. In general, as discussed above, it required county auditors to calculate an amount for each special district using a formula specified in the statute, and to then reduce the district's base for the 1993-1994 fiscal year by that amount. (§ 97.3, subd. (c)(1), (3)(A).) In the part of subdivision (c) describing the formula that county auditors were to use, the part that includes the District's quoted language, the statute says, as relevant here: "*On or before September 15, 1993*, the county auditor shall determine an amount for each special district [using a formula intended to equal the amount of the district's current property tax allocation that is attributable to its receipt of state assistance under A.B. 8]. . . . In the case of a special district that has been consolidated or reorganized, the auditor shall determine the amount of its current property tax allocation that is attributable to the prior district's or districts' receipt of state assistance payments [under A.B. 8]. . . ." (Italics added; see also Budget & Fiscal Revenue Com., analysis of Sen. Bill No. 1135 (1993-1994 Reg. Sess.) p. 5 [explaining that, under the proposed bill that would become ERAF II, "[t]he property tax revenue reduction for special districts is achieved by requiring the county auditor to determine the current amount of special districts' property tax revenues attributable to [their receipt of state assistance] under AB 8"].)[4]

 All the relevant language in section 97.3, then, only describes certain actions that

---

[4] To determine the amount of a district's 1993-1994 property tax allocation that was attributable to its earlier receipt of state assistance, section 97.3 directed county auditors to apply the following general formula for each district:

$$\frac{\text{1993-1994 property tax allocation x 1978-1979 state assistance amount}}{\text{1978-1979 state assistance amount} + \text{1978-1979 property tax allocation}}$$

(See § 97.3, subd. (c)(3)(A); Stats. 1992, ch. 699, § 14 [showing former § 98.6].)

each county auditor needed to take in 1993. In particular, in 1993, the auditor needed to determine for each district the amount of the district's current property tax allocation that was attributable either to (1) its earlier receipt of state assistance or (2) "[i]n the case of a special district that has been consolidated or reorganized," its predecessor's earlier receipt of state assistance. The auditor then needed (again, in 1993) to reduce the district's allocation of property tax revenue by this amount, subject to certain adjustments. (§ 97.3, subd. (c)(1); see also § 97.3, subd. (c)(3)-(4).) None of these requirements supports the District's reading of section 97.3.

Fourth, the District suggests that even if the County Auditor could have applied the ERAF shift of CSA 6, the auditor should have applied only part, not all, of its ERAF shift. The District, in particular, argues that it should have inherited only a portion of CSA 6's ERAF shift because CSA 6, unlike the District, was a multi-service district that provided both fire protection and wastewater services. It reasons that part of CSA 6's ERAF shift must have been "attributable to [its] sewer services" and the District, at most, should only inherit the part of CSA 6's ERAF shift that was attributable to its fire protection services.

We reject the argument. To accept the District's position, we would have to conclude that CSA 6 received at least some of its property tax revenues in its capacity as a sewer district. The ERAF statutes, after all, only apply to local agencies that receive property tax revenues; and so had CSA 6 not received property tax revenues in its capacity as a sewer district, then it would not have been subject to the ERAF statutes in this capacity. The trial court, however, rejected this necessary premise to the District's argument. It concluded that CSA 6 only received property tax revenues for its fire protection services—which meant that it received no property tax revenues for its sewer services. We find that substantial evidence supports this conclusion. As the District itself acknowledges in its reply brief, the only apparent evidence in the record on this topic, an accounting chart dating back to the 1989-1990 fiscal year, "indicat[es] that the

18

County allocated no [property] tax moneys to the wastewater function of CSA 6." And if "the County allocated no [property] tax moneys to the wastewater function of CSA 6," then we cannot say that CSA 6 could have contributed any property tax revenues to the ERAF in this capacity.

Fifth, the District suggests that even if the County Auditor could have applied the ERAF shift of CSA 6, the auditor might have miscalculated its ERAF II shift. Before turning to the substance of the District's argument, we begin with a little more background. The amount of the ERAF II shift for any special district, again, depended in large part on the amount of state assistance that the district received in the 1978-1979 fiscal year. In particular, it depended in large part on a ratio (called the Special District Augmentation Fund (or SDAF) ratio) that counties first calculated in 1979 and that equaled, for each special district, "the amount of state assistance payment for the special district for the 1978-79 fiscal year divided by the sum of the state assistance payment for the special district plus the amount of property tax revenue allocated to the special district for the 1978-79 fiscal year. . . ." (§ 97.3, subd. (c)(3)(A) [directing county auditors to apply a formula that relied in part on the ratio described in former § 98.6]; Stats. 1992, ch. 699, § 14 [showing the text of former § 98.6]; see also Stats. 1979, ch. 282, § 59 [initial enactment of former § 98.6].)

According to the District, the County Auditor might have overestimated the amount of state assistance that CSA 6 received in the 1978-1979 fiscal year and, as a result, might have overestimated CSA 6's ERAF II shift. The District's reasoning is twofold. In its first argument, it notes that, during discovery in this case, the County Auditor provided the "end SDAF [ratio]" for CSA 6 but not the inputs that went into calculating this ratio. Because the auditor's office has not shown its work from 1979 for calculating this ratio, the District argues that it is possible that the auditor's 1979 calculation of CSA 6's SDAF ratio, and thus the auditor's later calculation of CSA 6's ERAF II shift that relied on this ratio, was wrong. In its second argument, the District

asserts that CSA 6 "may not have received" all the state assistance that it was entitled to receive in the 1978-1979 fiscal year. It basis its argument on an email purportedly from someone named Del Walters that states: "The TAX RATE FACTOR for [Sea Ranch] is 19% or 19 cents on the value dollar. This factor was set by the Board of Supervisors at the time CSA #6 originated. They chuckled when I asked how this 19% was set. Apparently it's a political prerogative kind of thing." Based on this email, the District argues that CSA 6's total allocation of property tax revenues may have been based partly on "an arbitrary, politically based number the County created."

Both the District's arguments, however, are premised on speculation. Because the County no longer possesses documents showing the County Auditor's initial work in calculating CSA 6's SDAF ratio in 1979, the District speculates that the County Auditor might have miscalculated both CSA 6's SDAF ratio and its ERAF II shift. And because of some alleged chuckling from the County's Board of Supervisors, the District further speculates that CSA 6's total allocation of property tax revenues might have been based in part on the Board of Supervisors' selection of "an arbitrary, politically based number." But appeals are not won based on speculation of this sort. The District had the burden "to demonstrate, on the basis of the record presented to the appellate court, that the trial court committed an error that justifies reversal of the judgment." (*Jameson v. Desta* (2018) 5 Cal.5th 594, 609.) It has not met that burden.[5]

Finally, the District argues that the County Auditor imposed too high of an ERAF shift because, under ERAF I, a special district's "ERAF shift 'shall *not* exceed an amount

---

[5] The County Respondents contend the District's argument also fails for two other reasons. First, they assert that the District cannot now challenge a calculation that was "made over 25 years ago and has been us[ed] ever since without challenge." Second, they assert that their initial calculations under ERAF II are "presumed correct" because they were "audited by the [State Controller's Office]." (See § 96.1, subd. (b).) Because we agree, however, that the District failed to meet its burden to show that the trial court erred, we need not address these alternative arguments.

20

equal to 10 percent of that district's total annual revenues,' and may not exceed '40 percent of that district's property tax revenues *or* 10 percent of that district's total revenues, from whatever source' (the '10/40 Rule')." According to the District, the total shift imposed under ERAFs I and II of over 45 percent of the District's property tax revenues improperly exceeded both 40 percent of the District's property tax revenues and 10 percent of the District's total revenues.

But the language the District cites from ERAF I only limits the amount of the property tax revenue loss under ERAF I, not the combined loss of revenue under both ERAFs I and II. In arguing otherwise, the District ignores key parts of the relevant statutory text. Although it is true, as the District claims, that section 97.2 of ERAF I includes the words "shall not exceed an amount equal to 10 percent of that district's total annual revenues," the whole of the relevant text states: "No reduction pursuant to subparagraph (A), in conjunction with a reduction pursuant to paragraphs (1) and (2), for any special district, other than a countywide water agency that does not sell water at retail, shall exceed an amount equal to 10 percent of that district's total annual revenues, from whatever source. . . ." (§ 97.2, subd. (c)(3)(B).) The sentence as a whole, then, only places limitations on the "reduction[s] pursuant to subparagraph (A), in conjunction with a reduction pursuant to paragraphs (1) and (2)"—which are some of the reductions contemplated in section 97.2 of ERAF I, not the combined reductions in ERAFs I and II.

Similarly, although it is also true, as the District claims, that section 97.2 of ERAF I uses the words "shall [not] . . . exceed 40 percent of that district's property tax revenues or 10 percent of that district's total revenues, from whatever source," the whole of the relevant text states: "In no event shall the amount of the property tax revenue loss to a special district derived pursuant to subparagraphs (A) and (B) exceed 40 percent of that district's property tax revenues or 10 percent of that district's total revenues, from whatever source." (§ 97.2, subd. (c)(3)(C).) The sentence as a whole thus places limitations only on the reductions "derived pursuant to subparagraphs (A) and (B)"—

21

which, again, are some of the reductions contemplated in section 97.2 of ERAF I, not the combined reductions in ERAFs I and II.

The District counters that nothing in ERAF II or the legislative history shows that the Legislature intended to "exempt ERAF II from the 10/40 Rule." But the District, in making this argument, supposes that ERAF I purports to restrict all subsequent ERAF legislation. It suggests that ERAF I states, in effect, the following: "In no event shall the amount of the property tax revenue loss to a special district derived pursuant to [section 97.2 of ERAF I *and* section 97.3 of ERAF II] exceed 40 percent of that district's property tax revenues or 10 percent of that district's total revenues, from whatever source." But again, that is not what the statute says. The District further suggests that because ERAFs I and II are related statutes, all provisions in ERAF I should be understood to restrict all provisions in ERAF II. But endorsing that claim would be inconsistent with the entire premise of ERAF II, which was that ERAF I's limitations resulted in too little money being allocated to the ERAFs. It would also be inconsistent with basic principles of statutory interpretation. As courts have repeatedly explained, "[i]t is a settled principle of statutory interpretation that if a statute contains a provision regarding one subject, that provision's omission in the same or another statute regarding a related subject is evidence of a different legislative intent." (See *People v. Arriaga* (2014) 58 Cal.4th 950, 960.)

The District lastly, in support of its "10/40 Rule," asserts that the Legislature "intended to protect fire protection districts from excessive ERAF I reductions" and "did not intend ERAF II to lower the property taxes of special districts providing fire protection services." But although true that ERAF I has some provisions that limited the revenue reductions for fire protection districts (see § 97.2, subd. (c)(4)), the District never argues that the County Auditor misapplied those provisions. And although true that ERAF II also has some provisions that limited the revenue reductions for fire protection districts (see § 97.3, subd. (c)(4)), we cannot say that the Legislature intended no revenue reduction at all for these districts. We find that true, even though, as the District notes, a

22

senate committee analysis for the bill that became ERAF II stated that "special districts which perform fire protection activities . . . are not subject to a property tax revenue reduction under this bill." (Sen. Budget & Fiscal Revenue Com., analysis of Sen. Bill No. 1135 (1993-1994 Reg. Sess.) p. 5.) The District argues that, consistent with this statement of legislative intent, the Legislature enacted section 97.3, subdivision (c)(4)(ii) of ERAF II to prevent the potential loss of revenues for fire protection districts. But that provision, for reasons covered already, applied only to fire protection districts that were independent as of 1993; it did not apply to fire protection districts, like CSA 6, that were dependent as of that time. For that reason, even if the District's reading of section 97.3, subdivision (c)(4)(ii) were correct, it is of no relevance to our case.

DISPOSITION

The judgment is affirmed. Respondents are entitled to recover their costs on appeal. (Cal. Rules of Court, rule 8.278(a).)

_____\\s\\_____,
BLEASE, J.

We concur:

_____\\s\\_____,
RAYE, P. J.

_____\\s\\_____,
HULL J.